# United States Court of Appeals
## For the First Circuit

No. 02-2218

WALTER J. POWELL,

Plaintiff, Appellee,

v.

KATHLEEN ALEXANDER,

Defendant, Appellant,

CITY OF PITTSFIELD, EDWARD M. REILLY,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Selya, Lynch, and Lipez, Circuit Judges.

Kathleen Alexander, with whom Thomas C. Foley was on brief, for appellant.

David P. Hoose, with whom Howard S. Sasson and Katz, Sasson, Hoose, & Turnbull were on brief, for appellee.

November 24, 2004

**LIPEZ**, **Circuit Judge**.  In response to a judgment entered pursuant to 42 U.S.C. § 1983, defendant Kathleen Alexander, former City Solicitor of Pittsfield, Massachusetts, appeals from the district court's $10,000 punitive damages award against her.  First, Alexander argues that the court's specific factual determinations underlying the award of punitive damages are clearly erroneous and that the evidence in its totality does not meet the legal standard for such an award.  Second, Alexander argues that punitive damages are unavailable against her in any event because neither Powell's complaint nor the course of subsequent proceedings adequately put her on notice that she was being sued in her individual capacity and was therefore subject to personal liability for punitive damages.

After considering the general principles authorizing punitive damages in a § 1983 case, we reject Alexander's argument that the district court's award was incompatible with those principles.  We next consider a circuit split on the appropriate test for determining adequate notice of the capacity in which a governmental official is sued, and join the majority of circuits in adopting the "course of proceedings" test.  Applying that test, we reject Alexander's lack of notice claim and affirm the district court's award of punitive damages against her.

In 1991, Walter Powell, an African-American police officer, filed several state and federal actions against the City of Pittsfield, the Acting Chief of Police, and the former Mayor, among others, for impermissible race discrimination leading to his termination from the police force. In September 1993, City Solicitor Kathleen Alexander entered into a settlement agreement on the City's behalf. The City agreed to pay Powell $81,000 and to reinstate him as a police officer "conditioned upon" his fulfillment of certain requirements, including "re-training" and "undergoing a complete physical . . . examination." In return, Powell agreed to dismiss the actions, which had generated negative publicity for the City and fomented discord among members of the police department.

Instead of closing the book on a contentious period in City affairs, the signing of the settlement agreement marked the beginning of a new and even longer dispute. Indeed, nearly three years would pass before Powell returned to active duty as a Pittsfield police officer. As a result of that protracted struggle for the reinstatement contemplated by the settlement agreement, Powell filed the instant suit in federal district court in September 1997 against City Solicitor Alexander, the Mayor, the Chief of Police, the City Physician, and the City of Pittsfield for impeding and conspiring to impede his reinstatement to the City's

police force in retaliation for his exercise of his constitutional right to petition the courts for redress.[1]  Powell alleged that, far from cooperating with his efforts at reinstatement, the defendants had engaged in a concerted campaign to prevent or stall his return to the police force -- first by exploiting the possibility that his health was impaired by Hepatitis C infection, and then by selectively and belatedly enforcing a local ordinance barring police officers from holding outside employment[2] -- because he had filed the 1991 civil rights actions.

After a seven-day bench trial, the district court awarded judgment for Powell on all counts in an 87-page written decision containing 123 separately detailed findings of fact.[3]  The district

---

[1]None of the defendants named in the 1997 lawsuit, save the City of Pittsfield, was a party to the original 1991 lawsuit. Powell also alleged that the City had committed a breach of contract by failing to comply with the settlement agreement and had violated his rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.  Defendants Dr. Gordon T. Bird and Police Chief Gerald Lee were granted summary judgment on all claims against them in 2001, while Powell's claims under 42 U.S.C. §§ 1981 and 1983 survived summary judgment to the extent that they alleged retaliation for his exercise of his civil rights.  See Powell v. City of Pittsfield, 143 F. Supp. 2d 94 (D. Mass. 2001).  Powell's claims of retaliatory race discrimination in violation of 42 U.S.C. § 1981 against the remaining defendants were voluntarily dismissed before trial.

[2]Seeking income during the reinstatement process, Powell had started a taxi/limousine service.

[3]The district court held the City liable for violation of Section 504 of the Rehabilitation Act, breach of contract, and violation of 42 U.S.C. § 1983, and held the Mayor and City Solicitor Alexander liable under 42 U.S.C. §§ 1983 and 1985(2) for retaliation and conspiracy to retaliate against Powell for his

court found that, "[f]ollowing the settlement, the defendants began a campaign of obstruction, choreographed by the City Solicitor, designed to pressure or manipulate Powell into abandoning his plan to return to the police force." Powell v. City of Pittsfield, 221 F. Supp. 2d 119, 121 (D. Mass. 2002). Moreover, the court stated that while "Alexander may have seen herself as a vigorous advocate representing the interests of the Pittsfield police department, . . . her actions were especially unworthy of a City Solicitor." Id. at 152-53. The court awarded punitive damages in the amount of $10,000 against Alexander, who now challenges that award on appeal.

## II.

On appeal from a bench trial, we review a district court's factual findings for clear error and its legal conclusions de novo. See Fed. R. Civ. P. 52(a); Cariglia v. Hertz Equip. Rental Corp., 363 F.3d 77, 82 (1st Cir. 2004). Under the clear error standard of review, an appellate court will not disturb the factual determinations of a trial court unless, "after a searching review of the entire record, the court of appeals 'forms a strong, unyielding belief that a mistake has been made.'" Fed. Refinance Co. v. Klock, 352 F.3d 16, 27 (1st Cir. 2003) (quoting Cumpiano v.

exercise of his civil rights. Powell v. City of Pittsfield, 221 F. Supp. 2d 119 (D. Mass. 2002). Only Alexander appeals from the court's decision, and only with respect to its award of punitive damages.

Banco Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990)).  The trial judge "sees and hears the witnesses at first hand and comes to appreciate the nuances of the litigation in a way which appellate courts cannot hope to replicate." Cumpiano, 902 F.2d at 152.

**A.      The District Court's Factual Findings Supporting Punitive Damages**

      **1.     Three Letters and Two Notes**

Alexander challenges as clearly erroneous the factual determinations underpinning the district court's conclusion that her course of conduct in delaying Powell's reinstatement was, taken as a whole, "both outrageous and reprehensible," Powell, 221 F. Supp. 2d at 152.  She also challenges any finding that her conduct was motivated by wrongful intent or involved "reckless or callous indifference," Smith v. Wade, 461 U.S. 30, 56 (1983), to plaintiff's federal rights.  Crucial to the court's characterization of Alexander's "course of behavior" were three letters and two notes to which the district court adverted in its explanation of its assessment of punitive damages.  We briefly describe here the relevant pieces of correspondence, the notes, and their context.

      a.    Dr. Bird's December 21, 1993, Letter

Because he had been off the police force for three years following his termination and during settlement negotiations, Powell was required as a condition of reinstatement to undergo a

routine physical examination and to attend the police academy as though he were a new recruit.  In October 1993, a physical examination by the city physician, Dr. Bird, indicated that while Powell was outwardly physically fit and healthy, he had slightly abnormal liver function.  Later tests revealed that Powell had Hepatitis C, which may cause no physical symptoms and has a low risk of transmissibility through casual contact, but which can lead to serious liver disease.

On December 21, 1993, Dr. Bird wrote a letter to the City's personnel department and sent a copy to Powell in which he gave his opinion on Powell's physical fitness for reinstatement. The letter stated:

> After review of all of Mr. Powell's currently available laboratory work, his consultation [with a specialist], and the Physical Standards for Public Safety Positions used by the City, I feel that Mr. Powell has a condition which would disqualify him for appointment to a public safety position. Listed as a disqualifying condition is active hepatitis.  As it is my feeling, and that of the consultant, that Mr. Powell has chronic active hepatitis, I feel he would currently be disqualified.

The "standards" for "appointment to a public safety position" to which Dr. Bird referred were state guidelines used to determine candidates' eligibility for admission to "entry-level police officer training programs," namely, the police academy.  Dr. Bird apparently assumed that the police academy admission guidelines

also governed qualification for employment to the police force.[4] Dr. Bird's letter concluded: "If the City concurs in this disqualification, I understand that [Powell] has the right of appeal to a medical review board. Other options would be at the discretion of the appointing authority."

Alexander received a copy of Dr. Bird's letter from personnel department staff. Instead of either concurring in or overriding Dr. Bird's determination that Powell could not return to work, she requested that Powell undergo a liver biopsy before a final reinstatement decision could be made.

b. Alexander's May 12, 1994, Letter

Although Powell initially disputed that he had Hepatitis C, he did have a liver biopsy in March 1994 at a Veterans Affairs medical center in New York. In May 1994 his attorney forwarded a letter from Powell's physician to Alexander, which stated that "despite some laboratory evidence of mild liver function test abnormality, [Powell was] looking healthy and fit for his job as a police officer" and was "totally asymptomatic for acute or chronic liver disease."

On May 12, 1994, Alexander responded by letter to Powell's attorney that the City needed more information so that Dr.

_____

[4]Dr. Bird testified at trial that he concluded Powell was disqualified "primarily" because of the police academy admission guidelines, although he harbored additional concerns that even a low risk of infectivity through the blood could affect Powell's employability if he were injured in the line of duty.

Bird could review the biopsy results independently. Alexander wrote:

> [I]f the City [P]hysician is satisfied that Mr. Powell may safely return to work and perform his duties based upon [the additional biopsy data], [the Mayor] will then, assuming all other conditions are met, make a determination, with [the Chief of Police], in regard to reinstatement.

Powell promptly signed a release allowing the biopsy results to be transferred from the Veterans Affairs medical center to Dr. Bird for analysis.

### c.  Dr. Bird's July 5, 1994, Letter

On July 5, 1994, Dr. Bird wrote a letter to Alexander, which the court found to "constitute[], perhaps, the most significant piece of evidence in this case." Powell, 221 F. Supp. 2d at 132. The letter began: "I stated in a letter 12/21/93 that I felt [Powell] would be disqualified due to the presence of chronic active hepatitis." Dr. Bird then gave a detailed description of the liver biopsy results sent to him by Powell's doctor. Dr. Bird next related that he had consulted medical experts at the University of Massachusetts and the Centers for Disease Control, "seeking any information on guidelines for this condition," and discovered that no existing guidelines barred a person infected with Hepatitis C from working as a police officer. Dr. Bird stated: "The consensus was, given [Powell's] current state of health, that there would be currently no reason to limit his

physical activity."  Dr. Bird's letter concluded: "Now that the exact nature and stage of Mr. Powell's chronic liver disease is known, I feel that he does not have a condition which would disqualify him from returning to the police force."  Dr. Bird's copy of the letter, which he kept in his business files, was accompanied by a sticky note that read, "Confidential per request [of] K. Alexander."  Powell remained unaware of the letter's existence until it surfaced during discovery in the instant lawsuit.  At trial, Alexander denied that she had ever instructed Dr. Bird to suppress the letter.

### d.    Alexander's Handwritten Notes

As part of her routine business practice, Alexander kept handwritten, contemporaneous notes of her telephone conversations with various individuals involved in Powell's reinstatement, including the Mayor, Dr. Bird, and Powell's attorneys.  On April 4, 1994, Alexander consulted a colleague versed in civil service law.  Her notes of that phone conversation contain references to the "ADA," referring to the Americans with Disabilities Act of 1990, Pub. L. No. 101-336, § 2, 104 Stat. 327 (1990) ("ADA"); the possibility of "a major ADA problem"; and the availability of "punitive dmgs?," meaning punitive damages.[5]  A later note dated May 10, 1994, two days before Alexander wrote her letter of May 12,

_____

[5]See 42 U.S.C. § 1981a(a)(2) (authorizing punitive damages in certain actions brought under the ADA).

1994, to Powell's attorney, refers to the ADA's requirement of reasonable accommodations to qualified individuals with disabilities.[6] The district court treated these notes as evidence of Alexander's awareness that her conduct in delaying Powell's reinstatement would violate federal law.[7]

### 2. Factual Findings on Alexander's "Particularly Egregious Misconduct"

In light of this chronology of events and after assessing the credibility of the witnesses who testified at trial, the court determined that Alexander persisted in "particularly egregious misconduct," Powell, 221 F. Supp. 2d at 122, and that she "engaged in a course of behavior" that the court "deem[ed] to be 'outrageous and worthy of condemnation.'" Id. at 152 (citation omitted). The court then listed several examples of Alexander's egregious acts and omissions, "to name just a few," id., each of which Alexander alleges was a clearly erroneous factual determination. We also examine whether the findings, if supportable, amount to outrageous conduct in their cumulative effect.

---

[6]See 42 U.S.C. § 12112(b)(5)(A) (defining impermissible "discrimination" to include failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the] covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business").

[7]As we discuss below in Part II.B.3, the court erred in basing one of its legal conclusions supporting the availability of punitive damages under § 1983 on these notes.

a. <u>Alexander's Failure to Forward Dr. Bird's Original Report of December 21, 1993, to the Medical Review Board</u>

The district court found that Alexander failed to send Dr. Bird's first letter, which refers to "a medical review board," to that board, "in violation of her legal duties." <u>Id.</u> The medical review board, a body of the Massachusetts Criminal Justice Training Council, was authorized to grant exceptions allowing candidates with medical conditions to enroll in the police academy.[8] Alexander argues that she had no such legal duties because the City's personnel department handled all such matters.

The court stated that "Pittsfield's personnel department was unstaffed, and Alexander was fulfilling its responsibilities with regard to Powell." <u>Id.</u> at 127. Alexander counters that the department was "staffed and operating" at the time Powell sought reinstatement. The record shows that the personnel department was staffed but that it had no director at the relevant times. Personnel staff apparently gave Alexander a copy of Dr. Bird's letter because she was overseeing Powell's reinstatement under the settlement agreement.

---

[8]The Council's "Revised Interim Medical Guidelines and Procedures" provide: "The Medical Review Board may except candidates from these Medical Guidelines, in whole or in part, consistent with the principle of a Bona Fide Occupational Qualification (BFOQ) and the Reasonable Accommodation provisions" of the applicable Massachusetts state anti-discrimination statute.

This single misstatement by the district court that the personnel department was "unstaffed" is immaterial to the court's conclusion that Alexander should have referred Powell's case to the medical review board. Alexander undertook to coordinate Powell's reinstatement under the terms of the settlement, as evidenced by the voluminous correspondence documenting her central role in communicating various conditions of reinstatement to Powell's attorneys. The court was entitled to infer that Alexander had indeed taken control of the reinstatement process instead of leaving Powell's reinstatement for the City's personnel staff to handle according to routine procedures.

Although Dr. Bird forwarded to Alexander a copy of the police academy admission guidelines, including information about the medical review board, she stated at trial that she did not familiarize herself with them. Alexander asserts that, in contrast to Dr. Bird, she never viewed Powell's eligibility for admission to the police academy as determinative of his eligibility for reinstatement to the police force. Rather, "active hepatitis" might or might not be a bar to employment as a police officer, depending on the circumstances. Thus, Alexander maintains, any action by the medical review board permitting Powell's admission to the academy still would not have assuaged the City's independent concerns about his qualification for reinstatement: Only the liver

biopsy could have provided the information required to assess Powell's ability to return to the police force.[9]

Regardless of the City's ultimate decision under its own medical standards, the court found that Alexander's "failure . . . to submit the necessary documentation" to the medical review board "deprived Powell of the opportunity to obtain [an] exception [for admission to the police academy], which in view of his robust health and lack of symptoms he would very probably have received." Id. at 127. Alexander's "inaction left Powell in limbo." Id. Instead of being allowed to satisfy one of the prerequisites for his return to the police force even as his biopsy

---

[9]At trial, the parties disputed the City's need for liver biopsy results in order to make a reinstatement determination. The court found that Powell's expert medical witness "credibly opined that requiring a liver biopsy for purposes of assessing whether Powell was able to return to work was not reasonable . . . . [A] liver biopsy was proper solely for purposes of determining whether treatment might be appropriate, but the procedure would have told Powell's physicians 'nothing about employability.'" Powell, 221 F. Supp. 2d at 126-27. Alexander testified that she requested the biopsy for the purpose of assessing the potential consequences of treatment for Hepatitis C on Powell's physical condition, and that she did not receive a doctor's opinion on this point until 1996. At that time Powell submitted yet another doctor's opinion stating not only that Powell was physically fit but also that treatment for Hepatitis C "was mentioned to Mr. Powell and will be addressed in the future with him . . . [but] at this time . . . would not seem to be an obstacle to his returning to work." The court found that Alexander "suggest[ed] for the first time" on re-cross-examination at trial "that concerns about Powell's treatment had delayed his return to work. This testimony was not credible." Id. at 139. Powell also argued that the City's purported concern about the possible effects of treatment on his performance as a police officer constituted impermissible discrimination on the basis of disability.

-14-

and the City's final determination on reinstatement were pending, Powell "continued in his ambiguous status, neither qualified nor disqualified for reinstatement, until 1996." Id. The court committed no clear error in determining that Alexander should have ensured that Powell's case reached the medical review board.

      b.    <u>Alexander's Deliberate Suppression of Dr. Bird's July 5, 1994, Letter and Pressure on Dr. Bird to Suppress its Contents</u>

The court found that "Alexander deliberately hid" Dr. Bird's second letter of July 5, 1994, "which cleared Powell to go back to work, and pressured Dr. Bird to the point where he declined to communicate candidly with a patient of his who was suffering from a serious disease." Id. at 152. Based on testimony by the Mayor, Dr. Bird, and one of Powell's former attorneys,[10] the court found that the letter's existence was known only to Dr. Bird and to Alexander until its compelled disclosure during discovery. The court also credited Dr. Bird's testimony at trial that Alexander had told him to keep the letter confidential and to avoid communicating directly with Powell. Although "Alexander denied . . . ever asking Dr. Bird to keep the letter confidential," the court found that she had testified "without credibility" and had "conceded that she never told anyone else about the letter." Id. at 132.

---

    [10]Powell was represented by new counsel at trial, and one of his former attorneys was permitted to testify regarding his communications with Alexander.

Alexander stresses that she did not forward Dr. Bird's July 5, 1994, letter to the Mayor or to anyone else because she did not consider the letter to be a "report" reflecting the "City [P]hysician['s] satisf[action] that Mr. Powell may safely return to work and perform his duties" as required by her May 12, 1994, letter to Powell's attorney. She argues that Dr. Bird's second letter did not, in fact, "clear[] Powell to go back to work." Rather, Alexander interprets Dr. Bird's second letter as merely reflecting his own realization that Powell's disqualification for admission to the police academy did not automatically bar him from eventual employment as a police officer after all, a conclusion Alexander had reached long before in refusing to declare Powell qualified or disqualified for reinstatement (regardless of his eligibility for police academy admission) until he had a liver biopsy.

The court found Alexander's interpretation of Dr. Bird's July 5, 1994, letter untenable and her testimony that "she did not view the letter 'as significant' . . . because in her mind, it 'wasn't a report'" lacking in credibility. Id. Instead, after analyzing the text of both of Dr. Bird's letters and the trial testimony about the circumstances in which those letters were written, the court permissibly concluded that Dr. Bird's July 5, 1994, letter was indeed a "report," that it provided all the information Alexander purported to require in her May 12, 1994,

-16-

letter, and that it should have cleared the way for Powell's reinstatement as early as July 1994.

The district court had more than sufficient evidence before it from which to infer not only that Alexander's idiosyncratic interpretation of Dr. Bird's letter was objectively unreasonable, but also that she "obviously repressed [the letter] as part of the effort to forestall Powell's reinstatement and to avoid performing on [her] promise to permit reinstatement 'if the City [P]hysician is satisfied.'" Id. This finding was not clearly erroneous.

c. Alexander's Efforts to "Mask her Interference" and the Alleged Agreement to "Hold off" on Dr. Bird's Report

The district court found that "Alexander methodically kept a stream of letters going to Powell and his counsel in an effort to mask her interference with his reinstatement, and went so far as to manufacture a nonexistent agreement that Dr. Bird 'hold off' on his report on Powell's health." Id. at 152. Alexander maintains that Powell's attorney told her in a phone conversation on July 13, 1994, shortly after her receipt of Dr. Bird's July 5, 1994, letter, that Powell was now seeking disability retirement instead of reinstatement and that Dr. Bird could therefore "hold off" on writing a report based on the biopsy results regarding Powell's fitness for reinstatement. Alexander asserts that Dr. Bird was free at any time to send a copy of his July 5, 1994,

-17-

letter (which she did not consider to be a "report") to Powell, and that Dr. Bird misunderstood her direction to "hold off" on writing a true "report" (while Powell pursued disability retirement) as a direction to keep the letter under wraps. At trial, Powell's former attorney denied that he agreed to delay Dr. Bird's report and testified that it was Alexander who suggested that Powell apply for disability retirement. The court did not credit Alexander's testimony to the contrary.

In July 1994, unaware that Dr. Bird had just written to Alexander to state that he felt "that [Powell] does not have a condition which would disqualify him from returning to the police force," Powell sought Dr. Bird's signature on his application for disability retirement, based on Dr. Bird's original December 21, 1993, opinion that Powell was disqualified from employment on the police force. On July 28, 1994, Dr. Bird wrote to Powell, declining to sign the form and stating that Powell's "treating physician" should sign the form instead. In November 1994, after Powell approached him a second time to sign his disability form, Dr. Bird wrote to Powell that "[a]fter discussion of your request with the City Solicitor, I have been advised that it would be ethically inappropriate as the city physician for me to give you directly any statement of disability or complete the application" because "you are not under my professional care, nor have I been treating you." Dr. Bird testified that he would also have told

Powell that he did not consider him to be disabled if he had not been told to keep the information secret. Powell's application for disability retirement eventually stalled because he had not accrued the necessary number of service years on the police force.

During this same period, from September 1994 to January 1995, Alexander wrote monthly letters to Powell's attorneys seeking information on "the status of [his] application for [disability] retirement" and to discern "what, if anything, the City could do to help with closure of this matter." Each of these letters fails to mention Dr. Bird's change of opinion regarding Powell's fitness to work. The court specifically rejected the credibility of Alexander's trial testimony on cross-examination that it never occurred to her that Powell might have abandoned his disability retirement application if he had been aware of Dr. Bird's conclusions about his ability to return to the police force as stated in the July 5, 1994, letter.

The court also found that Alexander's September 20, 1994, letter to Powell's attorney, the first in a "stream of letters" regarding Powell's disability retirement application status, id., contained

> what can only be characterized as the outrageously misleading statement that at the time of settlement, "no one anticipated that [Powell] would have a health problem which would impede the reinstatement." This statement was made at a time when [Alexander] was perfectly aware of the unanimous medical opinion, including the considered view of the

-19-

> City's own physician, that <u>no</u> health problem impeded Powell's reinstatement.

<u>Id.</u> at 135 (first alteration in original).  In later correspondence with Powell's attorneys throughout the next year, Alexander continued to treat his medical condition as an unresolved issue.

Given this evidence, the court committed no clear error in concluding that:

> Alexander's failure to disclose . . . to [Powell's attorney] in her conversations with him that, as of July 5, 1994, she had in her possession unambiguous documentation of the City Physician's opinion that Powell <u>was</u> fit to return to work constitutes egregious misconduct and reflects the defendants' level of determination to retaliate against Powell for his earlier lawsuit by blocking his reinstatement by whatever means.

<u>Id.</u> at 133.

> d.  <u>Omission of the Letter from Submissions to the Court and Efforts to Involve Dr. Bird in Those Omissions</u>

The district court found that Alexander intentionally omitted any reference to Dr. Bird's July 5, 1994, letter from the affidavits and numerous exhibits she submitted to the court in 1996 in response to Powell's motion to vacate the settlement agreement. "Worse," the court found, "Alexander forced a kind of fraud upon Dr. Bird when she left any reference to the letter out of his affidavit, which she drafted."  <u>Id.</u> at 152.  As a result, the letter's existence remained unknown to anyone except Alexander and Dr. Bird until it materialized more than one year later during

-20-

discovery in Powell's 1997 lawsuit. The court thus found that "Alexander's deliberate suppression of the letter distorted the record submitted to the court in an effort to avoid disclosure of the defendants' bad faith." Id. at 138.

Alexander argues that she submitted the affidavits merely to document the City's timely responses to Powell's reinstatement requests and to show that any delay in Powell's reinstatement was not attributable to the City's lack of diligence but was the result of Powell's own equivocation about whether to pursue disability retirement instead. Dr. Bird's July 5, 1994, letter was, in her view, irrelevant to that showing. Yet Dr. Bird's affidavit describes his review of Powell's health status, including the biopsy results, in such detail that the absence of any reference to the July 5, 1994, letter in which he reported his conclusions based on that same review is striking.

Alexander reiterates that she simply did not view the July 5, 1994, letter or its contents as material to Dr. Bird's affidavit because it did not relate to the legitimate reasons for the delay in Powell's reinstatement, namely, Powell's own failure to satisfy the City's conditions by refusing to have a liver biopsy and by deciding to petition for disability retirement and expand his taxi/limousine business instead. The court refused to credit this argument in light of Alexander's professional experience as a

litigation attorney engaged in a dispute about Powell's employment qualifications.  Instead, the court found that

> [a]ny fair presentation of the documents pertinent to the dispute about reinstatement and the Settlement Agreement generally must necessarily have included the July 5th letter, which would have confirmed the absence for nearly two years of any impediment to Powell's reinstatement.

Id. The court did not err in determining that the effort required to exclude a single letter from a list of notes and other proof of the communications between Alexander and Dr. Bird in his affidavit constituted circumstantial evidence of deliberate omission.

The court also credited Dr. Bird's testimony that he himself viewed the omission from the affidavit as unusual, although he made no effort to correct it.  Alexander argues that she should not be charged with controlling Dr. Bird's submission to the court in the form of his affidavit merely because he misunderstood her directive to "hold off" on a "report" as meaning that he should keep his July 5, 1994, letter confidential.  She maintains that Dr. Bird could easily have overridden her judgment that the letter had no bearing on Powell's fulfillment of the settlement agreement's reinstatement conditions and that he could have made the appropriate additions to his own affidavit.[11]  We find no clear

_____

[11]At trial, Alexander sought to introduce into evidence a fax cover sheet that she sent to Dr. Bird along with the draft affidavit, inviting him to add any information he thought pertinent.  The district court excluded the fax cover sheet because it had not been listed as a proposed trial exhibit.  On appeal,

error in the court's conclusion, based on Dr. Bird's testimony and other evidence, that Dr. Bird deferred to Alexander's legal expertise, as he expected her to defer to his medical opinions.

As for Alexander's own affidavit, accompanied by forty-nine exhibits, in which she documented her efforts to cooperate with Powell's attorneys in his reinstatement effort, the court again was not clearly erroneous in finding that her decision to exclude the July 5, 1994, letter of Dr. Bird's from the court filing was deliberate, as was her decision in 1994 not to pass the letter on to Powell's attorney in the first place.

e.    Summary

In short, after a careful review of the evidence of Alexander's overall course of behavior, we find nothing clearly erroneous in the findings of the district court that, cumulatively, Alexander engaged in "particularly egregious misconduct," id. at 122, that was "outrageous and worthy of condemnation." Id. at 152 (internal quotation marks omitted).

**B.        Availability of Punitive Damages Under 42 U.S.C. § 1983**

**1.    General Principles**

Alexander argues that the evidence before the trial court, and the court's factual findings thereon, failed to meet the

---

Alexander does not challenge this ruling.

legal standard for an award of punitive damages.[12]  While "punitive damages are available in a 'proper' [42 U.S.C.] § 1983 action," Smith v. Wade, 461 U.S. 30, 35 (1983) (citation omitted),[13] such damages are "not favored in the law and are allowed only with caution and within normal limits," McKinnon v. Kwong Wah Rest., 83 F.3d 498, 508 (1st Cir. 1996).[14]  Whether a particular case arising under § 1983 is a "proper" case for an award of punitive damages is a question of law subject to de novo review.  See Marcano-Rivera v. Pueblo Int'l, Inc., 232 F.3d 245, 254 (1st Cir. 2000).

Punitive damages may be awarded under 42 U.S.C. § 1983 only where "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous

---

[12]Alexander also challenges as clearly erroneous the district court's findings supporting her liability for compensatory damages "to the extent that the district court's findings on the underlying retaliation claim may also be said to support the punitive damages award."  We find nothing clearly erroneous in the findings required to support the award of compensatory damages for the retaliation claim, and we discuss here the court's analysis of Alexander's underlying liability for deprivation of Powell's First Amendment right only to the extent necessary to provide a context for the court's punitive damages analysis.

[13]42 U.S.C. § 1983 states, in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . . "

[14]Alexander does not challenge the amount of the punitive damages award.

indifference to the federally protected rights of others." Smith, 461 U.S. at 56. The Supreme Court has stated that the requisite intent "at a minimum" is "recklessness in its subjective form." Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 536 (1999).[15] Thus, "the inquiry should focus on the acting party's state of mind," Romano v. U-Haul Int'l, 233 F.3d 655, 669 (1st Cir. 2000), and the central question is whether the defendant acted "in the face of a perceived risk that [her] actions [would] violate federal law," Kolstad, 527 U.S. at 536; see also DiMarco-Zappa v. Cabanillas, 238 F.3d 25, 38 (1st Cir. 2001).

We have interpreted Kolstad as distinguishing between a defendant's "intent to do [an] act" and her intent "to effect a civil rights violation" as a consequence of that act. Iacobucci v. Boulter, 193 F.3d 14, 26 (1st Cir. 1999) (citation omitted). The Kolstad Court described several situations in the employment discrimination context in which punitive damages may be inappropriate even though a defendant has engaged in intentional acts of discrimination:

> In some instances, [an] employer may simply be unaware of the relevant federal prohibition. There will be cases, moreover, in which the employer discriminates with the distinct belief that its discrimination is lawful. The underlying theory of discrimination may be

---

[15]While Kolstad addressed a claim for punitive damages under 42 U.S.C. § 1981a, we consider "Kolstad's teachings [to be] fully applicable to punitive damages under section 1983." Iacobucci v. Boulter, 193 F.3d 14, 25 n.7 (1st Cir. 1999).

-25-

> novel or otherwise poorly recognized, or an employer may reasonably believe that its discrimination satisfies a bona fide occupational qualification defense or other statutory exception to liability.

Id. at 536-37.[16] Where the underlying liability for deprivation of a federally protected right under § 1983 rests on a finding of intentional conduct, then, the state of mind requirement for the availability of punitive damages limits those damages to that "subset of cases," id. at 534, in which a plaintiff also adduces evidence that permits an inference that the defendant was aware of the risk that those intentional acts would violate federal law.

### 2. Powell's Constitutionally Protected Right to Petition the Courts for Redress of Grievances

As the district court recognized, "[o]ur constitutional system gives every citizen the right to seek redress in the courts . . . without fear that recourse to the law will make that citizen a target for retaliation." Powell, 221 F. Supp. 2d at 121. The First Amendment to the U.S. Constitution provides, in relevant part: "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of

---

[16]This case does not resemble any of these situations. Alexander did not argue at trial that her retaliation for Powell's exercise of his First Amendment right to petition the courts was somehow lawful or that Powell's filing of the 1991 lawsuit was beyond the scope of the First Amendment's protection. Rather, she contested the factual basis for a finding of retaliation in the first instance.

-26-

grievances."  For decades, the Supreme Court has consistently recognized the right to petition all branches of the government, including the courts, Cal. Motor Transp. Co. v. Trucking Unltd., 404 U.S. 508, 510 (1972), for redress of grievances as "among the most precious of the liberties safeguarded by the Bill of Rights." United Mine Workers, Dist. 12 v. Ill. State Bar Ass'n, 389 U.S. 217, 222 (1967).[17]  The Supreme Court has also identified "the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation -- and their ideas from suppression -- at the hand of an intolerant society."  McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 357 (1995).

Claims of retaliation for the exercise of First Amendment rights are cognizable under § 1983.  See, e.g., Mt. Healthy City

---

[17]The right to petition the courts for redress also implicates the First Amendment right of free speech. See United Mine Workers, 389 U.S. at 222 (rights to assemble and to petition the government for redress of grievances "are . . . intimately connected, both in origin and in purpose, with the other First Amendment rights of free speech and free press. 'All these, though not identical, are inseparable.'") (quoting Thomas v. Collins, 323 U.S. 516, 530 (1945)); NAACP v. Button, 371 U.S. 415, 429 (1965) (civil rights "litigation is a means for achieving the lawful objectives of equality of treatment by all government . . . . It is thus a form of political expression . . . . And under the conditions of modern government, litigation may well be the sole practicable avenue open to a minority to petition for redress of grievances."); see also Robert L. Tsai, Conceptualizing Constitutional Litigation as Anti-Government Expression: A Speech-Centered Theory of Court Access, 51 Am. U. L. Rev. 835, 838 (2002) (advocating treatment of "an individual's efforts to secure her constitutional rights as the equivalent of engaging in anti-government expression").

Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977) (school board's refusal to renew untenured teacher's contract in retaliation for exercise of right to free speech actionable). "Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights." ACLU of Md., Inc. v. Wicomico County, 999 F.2d 780, 785 (4th Cir. 1993). Retaliation for the exercise of the right to petition the courts for redress may take many forms, ranging from potential negative treatment for the mere threat to file suit in the future, see, e.g., Poole v. County of Otero, 271 F.3d 955, 960 (10th Cir. 2001) (recognizing retaliatory prosecution claim where police instituted criminal charges after receiving indication of plaintiff's intent to file civil suit), to actual economic injury following the filing or pursuit of grievances, see, e.g, Collins v. Nuzzo, 244 F.3d 246, 251 n.2 (1st Cir. 2001) (treating claim that license application was denied because of applicant's exercise of right to appeal prior denial of license renewal as "an ordinary claim of unconstitutional retaliation for protected speech in violation of the First Amendment"); Fishman v. Clancy, 763 F.2d 485, 486-87 (1st Cir. 1985) (attempts to terminate public school teacher who had filed more grievances "than any other . . . teacher had ever filed" and who had engaged in other First Amendment activities cognizable under § 1983).

In order to prevail on a § 1983 claim of retaliation for First Amendment activity under the legal standard enunciated in Mt. Healthy, a plaintiff must first show "that his conduct was constitutionally protected, and that this conduct was a 'substantial factor' or . . . a 'motivating factor'" for the defendant's retaliatory decision. 429 U.S. at 287. The defendant may then avoid a finding of liability by showing that "it would have reached the same decision . . . even in the absence of the protected conduct." Id.[18]

> In this case, the district court concluded:
>
> There is no question that Powell engaged in constitutionally protected conduct by filing the 1991 lawsuit against Pittsfield, its officials, and police officers. Defendants have not alleged that Powell's 1991 litigation was "baseless" and therefore not within the shelter of the First Amendment, see Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 741, 76 L. Ed. 2d 277, 103 S. Ct. 2161 (1983), or otherwise unprotected. Connick v. Myers, 461 U.S. 138, 148 n.8, 75 L. Ed. 2d 708, 103 S. Ct. 1684 (1983) ("right to protest racial discrimination [is] a matter inherently of public concern"). Given the substantial settlement obtained by the plaintiff in 1993, any argument that the 1991 lawsuit was baseless would be frivolous.

Powell, 221 F. Supp. 2d at 140-41. The court found that Powell's lawsuit alleging racial discrimination created hostility in the

_____

[18]We recognize that "[a] retaliatory state of mind typically is not susceptible to proof by direct evidence." Ferranti v. Moran, 618 F.2d 888, 892 (1st Cir. 1980) (plaintiff properly stated claim of retaliation based on circumstantial evidence).

-29-

police department, id. at 124, which Alexander represented as City Solicitor, and that she was aware that his return to the police force would cause "friction." Id. The district court then concluded that, more likely than not, Alexander and the Mayor retaliated against Powell for his constitutionally protected conduct because they "knew that if [he] was reinstated and thereafter filed another lawsuit, they would have to deal with it." Id. at 142.[19]

### 3.    The District Court's Punitive Damages Analysis

In its richly detailed and carefully crafted 87-page opinion, the court devoted slightly less than two pages at the end of the opinion to its punitive damages analysis. This observation is not a criticism. Rather, we make that observation to make the important point that the relatively brief punitive damages analysis at the end of the opinion unmistakably draws upon the compendious factfinding and legal analysis on the claim for compensatory damages that precedes it.

Based on Alexander's handwritten notes documenting her phone conversation with a colleague about the ADA, the district court concluded in part that punitive damages were authorized in this case because "Alexander's notes reflect that she was aware

---

[19]The court also found that Alexander failed to establish by a preponderance of the evidence that she would have made the same decision to delay Powell's reinstatement in the absence of his protected conduct. See Powell, 221 F. Supp. 2d at 143.

-30-

that her actions violated federal law, and thus she 'acted in the face of a perceived risk that [her] actions'" would lead to that result. Id. at 152 (quoting Kolstad, 527 U.S. at 536) (alteration in original).[20] However, the "federal law" to which "Alexander's notes" refer (the ADA) was not in fact the same federal law that the court found Alexander to have violated (the First Amendment right to seek redress in the courts as protected by § 1983). Indeed, Powell brought no claim under the ADA against any of the defendants, and only the City of Pittsfield was subject to his claim under the related Rehabilitation Act.[21] Id. at 122.

In order to recover punitive damages, a plaintiff ordinarily must "establish[] liability for either compensatory or nominal damages." Kerr-Selgas v. Am. Airlines, Inc., 69 F.3d 1205, 1215 (1st Cir. 1995) (plaintiff must make "a timely request for nominal damages"). Given the absence of a claim by Powell that Alexander violated his rights under the ADA, her subjective awareness of the risk that she might violate Powell's rights under

---

[20]Our review of the record having revealed no notes written by Alexander that explicitly refer to any other federal law, we assume that the district court referred to her notes on the ADA alone.

[21]The Rehabilitation Act provides, in relevant part: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service." 29 U.S.C. § 794(a). See also id. § 794(d) (adopting standards of the ADA for application).

-31-

the ADA with her retaliatory conduct is irrelevant to the propriety of an award of punitive damages for a § 1983 violation of a First Amendment right. See Iacobucci, 193 F.3d at 27 (evidence tending to show that defendant was aware of the risk of violating plaintiff's right to be free from excessive force during arrest had no bearing on defendant's subjective intent towards plaintiff's right to be free from arrest without probable cause, the right defendant actually violated under § 1983). The court's determination that Alexander perceived the risk that her actions would violate Powell's federally protected rights under the ADA, therefore, does not support an award of punitive damages for Alexander's violation of Powell's First Amendment right to petition the courts for redress. Instead, the court had to find, explicitly or implicitly, that Alexander's retaliatory actions manifested at least "reckless or callous indifference to" Powell's First Amendment right. Smith, 461 U.S. at 56. For the reasons we now set forth, we are satisfied that the court implicitly made such a finding, and that this finding is legally and factually supportable.

In its punitive damages analysis, the district court also justified its award of punitive damages because "Alexander's actions in this case were both outrageous and reprehensible." Powell, 221 F. Supp. 2d at 152. The court then provided a non-exhaustive list of examples of her acts and omissions, discussed in

detail above in Part II.A.2, underlying that determination. "In short," the district court concluded, "Alexander engaged in a course of behavior that this court deems to be outrageous and worthy of condemnation." Id. (internal quotation marks omitted).

While the Supreme Court's decision in Kolstad clarified that "the presence (or absence)" of egregious or outrageous acts "does not in itself determine the propriety (or lack of propriety) of punitive damages in a given case," Iacobucci, 193 F.3d at 26 (citation omitted), such damages remain available where a defendant's egregious intentional conduct itself demonstrates her perception of a "risk that [her] actions [would] violate federal law." Kolstad, 527 U.S. at 536. "To be sure, egregious or outrageous acts may serve as evidence supporting an inference of the requisite 'evil motive.'" Id. at 538. Indeed, "[c]onduct warranting punitive awards has been characterized as 'egregious' . . . because of the defendant's mental state." Id.

We have described the plaintiff's obligation to demonstrate a defendant's state of mind regarding the consequences of her intentional acts as "a heightened burden." Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 84 (1st Cir. 2001) (distinguishing state law standard for punitive damages from that imposed by § 1983). This description merely reflects the dual purposes that a plaintiff's evidence must serve in a case where punitive damages are sought; it does not preclude evidence of

egregious misconduct from serving, in appropriate circumstances, both as evidence of the alleged violation of a federal right and as evidence of the defendant's awareness of the risk that her actions would violate that federal right.

Indeed, in cases involving retaliation, a defendant's "actions and the effect of those actions are closely connected in a way not necessarily present in other types of cases." Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 41 (1st Cir. 2003) (remanding for jury trial on punitive damages where employer engaged in "intentional discriminatory retaliation"). The legal standard for a finding of liability for retaliation (the underlying liability claim in a case such as this) already entails an inquiry into a defendant's motive as well as into the legally protected nature of the plaintiff's conduct. See Mt. Healthy, 429 U.S. at 287 (plaintiff must show "that his conduct was constitutionally protected, and that this conduct was a 'substantial factor' or . . . a 'motivating factor'" for the defendant's retaliatory decision to shift burden to defendant). Where a defendant engages in particularly "outrageous" acts of retaliation and where the right whose exercise triggers those retaliatory acts is a well-established constitutional right, a factfinder "could, but need not, fairly infer that the [defendant] harbored malice or reckless indifference" towards that federal right. Che, 342 F.3d at 42.

Although the specific intent to violate a plaintiff's federally protected right will support a punitive damages award, "reckless indifference" towards a plaintiff's federally protected right also suffices to authorize liability for punitive damages under § 1983.[22]  See, e.g., Dimarco-Zappa, 238 F.3d at 38 (finding no abuse of discretion in award of punitive damages where "[t]he extent of federal statutory and constitutional law preventing discrimination on the basis of ethnicity or race suggests that defendants had to know that such discrimination was illegal, and that [defendants' discriminatory conduct] exhibited 'reckless and callous indifference' to [plaintiff's] federal rights, if not evil intent.") (citation omitted); Rubinstein v. Adm'rs of Tulane Educ. Fund, 218 F.3d 392, 406 (5th Cir. 2000) (evidence that defendant's agent retaliated against plaintiff "because he 'hauled colleagues

_____

[22]In his majority opinion in Smith v. Wade, 461 U.S. at 42-43, Justice Brennan parsed various formulations of the standard of recklessness that suffices to authorize an award of punitive damages in the absence of "actual malice."  He quoted the standard announced in Milwaukee & St. Paul Ry. Co. v. Arms, 91 U.S. 489, 493, 495 (1876), as an exemplar: "that reckless indifference to the rights of others which is equivalent to an intentional violation of them . . . that entire want of care which would raise the presumption of a conscious indifference to consequences."  Justice Brennan noted that this standard distinguishes between "indifference, conscious or otherwise," and "intent," while holding both states of mind of similar culpability.  Smith, 461 U.S. at 43 n.10.  In Kolstad, the Supreme Court clarified that in the context of intentional discrimination, a defendant must act "in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages."  Kolstad, 527 U.S. at 536.  We have thus described the standard as requiring "conscious indifference" towards a plaintiff's federally protected rights.  Iacobucci, 193 F.3d at 26.

into court to try to resolve differences' . . . indicates a healthy disdain for [plaintiff's] rights to seek redress in the courts for perceived wrongs [and was] adequate to meet the standard of reckless indifference at least, if not outright animus, towards those rights").

As noted, the court found that Alexander's retaliatory actions "were especially unworthy of a City Solicitor." Powell, 221 F. Supp. 2d at 152-53. In our judgment, this focus by the court on conduct unworthy of an attorney reflects the district court's implicit finding that Alexander, as a former general litigator, as City Solicitor (however overburdened and inexperienced in municipal law),[23] and as the attorney who negotiated the 1993 settlement agreement, recognized and acted with "reckless or callous indifference" towards Powell's constitutional right to petition the courts for redress. Smith, 461 U.S. at 56. In other words, as an attorney, Alexander surely understood that Powell's filing of his 1991 lawsuit was an exercise of his First Amendment right to petition the government for redress, and that in retaliating against him for the filing of that lawsuit she risked

---

[23]According to the district court, "[w]hen [Alexander] started [the job of City Solicitor], the [S]olicitor's office was in bad shape. There was a huge number of cases, and files were on the floor. Alexander had been a general litigator and had no experience in municipal law. She was working 12-15 hours per day, 6 days a week, and had only one half-time assistant. Due to her efforts, the organization and professionalism of the Solicitor's office quick[l]y improved." Powell, 221 F. Supp. 2d at 122.

violating his right under the Constitution. Her conduct was particularly unworthy of a City Solicitor because of her callous indifference to Powell's exercise of that right. Indeed, Alexander never argued at trial or on appeal that Powell's filing of his 1991 lawsuit was not protected by the First Amendment or that she was unaware that retaliation against Powell could violate his First Amendment right to seek redress in the courts. Moreover, there is substantial evidence in this record of Alexander's "consciousness of wrongdoing," McKinnon, 83 F.3d at 509, in the form of her elaborate efforts to prevent Dr. Bird's critical July 5, 1994, letter (which the court found "cleared Powell to go back to work," Powell 221 F. Supp. 2d at 152), from coming to light.

We conclude, therefore, that the district court's detailed factual analysis of Alexander's conduct, including the examples it specifically identified as "outrageous and reprehensible" and "especially unworthy of a City Solicitor," Powell, 221 F. Supp. 2d at 152-53, supports its implied finding that Alexander acted "in the face of a perceived risk that [her] actions [would] violate federal law [Powell's First Amendment right under § 1983]," Kolstad, 527 U.S. at 536, and thus with sufficient "evil motive" or "reckless or callous indifference to the federally protected rights of others," Smith, 461 U.S. at 56, to meet the legal standard for punitive damages under § 1983.

-37-

We turn to Alexander's argument, raised for the first time on appeal, that she is not subject to punitive damages because she did not have proper notice that she was being sued in her individual capacity.[24]  Both Powell's complaint and amended complaint were silent on the capacity in which he sought to sue Alexander, whom the complaints identified as "a natural person who at all times pertinent to this complaint was the City Solicitor for the defendant City of Pittsfield."

## A.        Per Se Approach or Course of Proceedings

Alexander invites us to adopt a bright-line, or "per se," approach to resolving a complaint's ambiguity or silence on the issue of capacity, such as that employed by the Eighth Circuit. Under this approach, a defendant governmental official is presumed to be sued solely in his or her official capacity unless the complaint specifically states otherwise.  See, e.g., Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999) ("[O]nly an express statement that [governmental officials] are being sued in their individual capacity will suffice to give proper notice to

---

[24]Powell argues that Alexander has forfeited this issue by failing to raise it by objection to the magistrate judge's report and recommendation regarding summary judgment, at trial in her motions pursuant to Fed. R. Civ. P. 52(c), or after trial in a motion to amend judgment or motion for a new trial.  This court may, in its discretion, excuse forfeiture, and we choose to do so here to resolve this important issue.  Chestnut v. City of Lowell, 305 F.3d 18, 20 (1st Cir. 2002) (en banc) (per curiam).

the defendants . . . ."); <u>Egerdahl</u> v. <u>Hibbing Cmty. Coll.</u>, 72 F.3d 615, 620 (8th Cir. 1995) ("[P]laintiff's complaint [must] contain a clear statement of her wish to sue defendants in their personal capacities."). In <u>Nix</u> v. <u>Norman</u>, 879 F.2d 429, 431 (8th Cir. 1989), the Eighth Circuit emphasized the importance of giving governmental officials clear notice of the capacity in which they are being sued at the outset of litigation -- in the complaint itself. Early and explicit notice permits governmental official defendants who are subject to personal liability for monetary damages to assess matters crucial to their litigation strategy, including the propriety of raising particular defenses available only to governmental officials sued in a particular capacity. For example, while an official-capacity defendant may raise the defense of sovereign immunity, a personal-capacity defendant may assert "objectively reasonable reliance on existing law," a defense not available to official-capacity defendants. <u>See</u> <u>Kentucky</u> v. <u>Graham</u>, 473 U.S. 159, 167 (1985) (setting forth defenses to liability under § 1983 to "illustrate the basic distinction between personal- and official-capacity actions"). Defendants with early notice of potential personal liability may also assess "the availability of insurance coverage and whether there are potential conflicts of interest that might require separate representation of defendants." <u>Charron</u> v. <u>Picano</u>, 811 F. Supp. 768, 772 (D.R.I. 1993).

Notwithstanding the concerns reflected in the Eighth Circuit's analysis, the other circuits have, with virtual unanimity, adopted the "course of proceedings" test as the better approach.[25] The Supreme Court has also acknowledged that:

> in many cases, the complaint will not clearly specify whether officials are sued personally, in their official capacity, or both. "The course of proceedings" in such cases typically will indicate the nature of the liability sought to be imposed.

Graham, 473 U.S. at 167 n.14 (quoting Brandon v. Holt, 469 U.S. 464, 469 (1985)). We now join the multitude of circuits employing the "course of proceedings" test, which appropriately balances a defendant's need for fair notice of potential personal liability against a plaintiff's need for the flexibility to develop his or her case as the unfolding events of litigation warrant. In doing so, we decline to adopt a formalistic "bright-line" test requiring

---

[25]See, e.g., Moore v. City of Harriman, 272 F.3d 769, 772 (6th Cir. 2001); Atchinson v. District of Columbia, 73 F.3d 418, 425 (D.C. Cir. 1996) (approving course of proceedings test but declining to employ it where complaint was not silent on issue of capacity of suit); Biggs v. Meadows, 66 F.3d 56, 58 (4th Cir. 1995); Colvin v. McDougall, 62 F.3d 1316, 1317 (11th Cir. 1995); Frank v. Relin, 1 F.3d 1317, 1326 (2d Cir. 1993); Houston v. Reich, 932 F.2d 883, 884 (10th Cir. 1991); Price v. Akaka, 928 F.2d 824, 828 (9th Cir. 1990); Melo v. Hafer, 912 F.2d 628, 635 (3d Cir. 1990), aff'd on other grounds, 502 U.S. 21, 24 n.* (1991) (declining to resolve circuit split on proper approach to capacity analysis); Shockley v. Jones, 823 F.2d 1068, 1071 (7th Cir. 1987) (presumption favoring official-capacity suit only is not conclusive; "a court must look to the manner in which the parties have treated [the] suit"). See also Pieve-Marín v. Combas-Sancho, 967 F. Supp. 667, 669 (D.P.R. 1997) (applying course of proceedings test); but see Charron, 811 F. Supp. at 772 (D.R.I. 1993) (applying per se test).

a plaintiff to use specific words in his or her complaint in order to pursue a particular defendant in a particular capacity. However, we do not encourage the filing of complaints which do not clearly specify that a defendant is sued in an individual capacity. To the contrary, it is a far better practice for the allegations in the complaint to be specific. A plaintiff who leaves the issue murky in the complaint runs considerable risks under the doctrine we adopt today.

Under the "course of proceedings" test, courts are not limited by the presence or absence of language identifying capacity to suit on the face of the complaint alone. Rather, courts may examine "the substance of the pleadings and the course of proceedings in order to determine whether the suit is for individual or official liability." Pride v. Does, 997 F.2d 712, 715 (10th Cir. 1993). Factors relevant to this analysis include "the nature of the plaintiff's claims, requests for compensatory or punitive damages, and the nature of any defenses raised in response to the complaint, particularly claims of qualified immunity." Moore v. City of Harriman, 272 F.3d 769, 772 n.1 (6th Cir. 2001); see also Biggs v. Meadows, 66 F.3d 56, 61 (4th Cir. 1995). A court may also take into consideration "whether the parties are still in the early stages of litigation," Moore, 272 F.3d at 772 n.1, including whether amendment of the complaint may be appropriate. No single factor is dispositive in an assessment of the course of

proceedings. "Throughout, the underlying inquiry remains whether the plaintiff's intention to hold a defendant personally liable can be ascertained fairly." Biggs, 66 F.3d at 61.

**B.        The Course of Proceedings Here**

In this case, the course of proceedings gave Alexander fair notice that she was being sued in her individual capacity. First, Powell's complaint and amended complaint contained a prayer for punitive damages. The prayer for punitive damages could only be brought against defendant governmental officials who were sued in their individual capacities. Claims for punitive damages are not available against a municipality, such as the City of Pittsfield, under § 1983. City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 259-60 (1981). Because bringing suit against a governmental official in his or her official capacity is tantamount to bringing "suit against the official's office," Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989), it follows that punitive damages are not available against governmental officials sued in their official capacities. See Biggs, 66 F.3d at 61. Recognizing these legal principles, Alexander filed a joint answer on behalf of all the defendants named in Powell's complaint, raising, among other affirmative defenses, a qualified immunity defense. "[T]he assertion of that defense indicates that the defendant interpreted the plaintiff's action as being against [her] personally." Biggs, 66 F.3d at 61.

Alexander argues that both Powell's claim for punitive damages and her assertion of a qualified immunity defense were merely perfunctory pleadings and should not be taken as notice of the capacity in which she was sued. Yet "the assertion of qualified immunity provides some indication" that Alexander is "not prejudiced by our treating [the] complaint as one brought against [her] in [her] personal capacit[y]." Id. (according less weight to raising of qualified immunity defense where defendants also raised sovereign immunity).

Alexander also argues that subsequent indications of the capacity in which she was sued came too late in the litigation to provide her with adequate notice. For example, the magistrate judge's conclusion that Alexander was being sued in her individual capacity emerged only in a report and recommendation regarding summary judgment, more than three years after the litigation's inception. See Powell v. City of Pittsfield, 143 F. Supp. 2d 94, 115 (D. Mass. 2001) (adopting magistrate judge's report and recommendation discussing availability of suit against defendants in their individual capacity under various statutes). However, the relevant time frame of the course of proceedings varies for each individual case and may include events occurring after the initial pleadings. See, e.g., Moore, 272 F.3d at 774 ("Subsequent filings in a case," including responses to motions to dismiss for failure to state a claim or to motions for summary judgment, "may rectify

-43-

deficiencies in the initial pleadings."); Houston v. Reich, 932 F.2d 883, 885 (10th Cir. 1991) ("pleadings, pre-trial order, and [jury] instructions ma[d]e it clear" that defendants were being sued in both official and individual capacities). Here, Alexander reiterated her early assertion of qualified immunity as an affirmative defense in her individual motion for summary judgment.

Alexander makes much of the fact that Powell's complaint identified her as "a natural person who at all times pertinent . . . was the City Solicitor for the defendant City of Pittsfield," that is, as a municipal governmental official. She asserts that this language strongly suggests Powell intended to sue her solely in her official capacity. However, "under § 1983, a plaintiff may sue a [governmental] officer in [her] individual capacity for alleged wrongs committed by the officer in [her] official capacity." Price v. Akaka, 928 F.2d 824, 828 (9th Cir. 1990). It simply "does not follow that every time a public official acts under color of state law, the suit must of necessity be one against the official in his or her official capacity." Melo v. Hafer, 912 F.2d 628, 636 (3d Cir. 1990), aff'd, 502 U.S. 21 (1991).

Powell points out that he did not seek to establish that Alexander "acted in accordance with a governmental policy or custom," Biggs, 66 F.3d at 61, as would be expected in an official-capacity suit. See Conner v. Reinhard, 847 F.2d 384, 394 n.8 (7th

-44-

Cir. 1988) (noting plaintiff's failure to "assert that the defendants followed a policy or custom" of the city as required in official-capacity suit). Powell thus argues that he gave no indication here that he was suing Alexander in her official capacity, much less solely in that capacity. Of course, Powell was free to sue Alexander in either or both of her official and personal capacities. Thus, the central inquiry remains whether the course of proceedings here gave Alexander fair notice of an individual-capacity suit, regardless of the presence or absence of allegations supporting an official-capacity suit.

Viewed as a whole, the course of proceedings in this case gave Alexander fair notice that she was being sued in her individual capacity and was subject to personal liability for punitive damages.

## IV.

Powell moves for reasonable attorney's fees and costs of appeal pursuant to 42 U.S.C. § 1988. Recognizing that the availability of such an award is intended to compensate prevailing plaintiffs for the time and expense required to vindicate their federally protected civil rights, see Aubin v. Fudala, 821 F.2d 45, 47 (1st Cir. 1987); Coalition for Basic Human Needs v. King, 691 F.2d 597, 602-03 (1st Cir. 1982), we grant Powell's motion and remand to the district court for a determination of the appropriate amount of attorney's fees and costs. See Aubin, 821 F.2d at 48

(remanding for award of attorney's fees and costs incurred on appeal); Souza v. Southworth, 564 F.2d 609, 613 (1st Cir. 1977) (award of attorney's fees for appellate work involves "factual findings more appropriately made by a district court" than by court of appeals).

Powell also moves for an additional or alternative award of "just damages and single or double costs" pursuant to Federal Rule of Appellate Procedure 38 on the ground that Alexander's appeal was frivolous. Although we affirm the district court's award of punitive damages and decline Alexander's invitation to adopt a "per se" approach to the issue of pleading the capacity in which a governmental official is sued, this appeal was not frivolous. Establishing that a trial court's factual findings are clearly erroneous may be "a steep uphill climb," Fed. Refinance Co., 352 F.3d at 27, but it is not an impossible feat. Moreover, Alexander was entitled to de novo review on the ultimate question of whether she had the requisite state of mind to support an award of punitive damages. Finally, Alexander's reliance on Eighth Circuit precedent as persuasive authority supporting her argument for a "per se" rule on capacity, an issue of first impression in this circuit, was plausible. Finding that Alexander's appeal was neither "perfunctory" nor wasteful of judicial resources, see Johnson v. Allyn & Bacon, Inc., 731 F.2d 64, 74 (1st Cir. 1984), we deny Powell's Rule 38 motion.

Affirmed.  Remanded for an award of reasonable attorney's fees and costs of appeal pursuant to 42 U.S.C. § 1988.