# United States Court of Appeals
## For the First Circuit

Nos. 08-1692, 08-1730

WILLIAM T. BRODERICK,

Plaintiff-Appellee/Cross-Appellant,

v.

PAUL EVANS, Individually and as Police Commissioner
of the City of Boston; CITY OF BOSTON,

Defendants-Appellants/Cross-Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before
Boudin, Tashima,[*] and Howard,
Circuit Judges.

Mary Jo Harris with whom Robert P. Morris and Morgan, Brown &
Joy LLP were on brief for defendants-appellants/cross-appellees.
Michael W. Reilly with whom Tommasino & Tommasino and Rosemary
Curran Scapicchio were on brief for plaintiff-appellee/cross-
appellant.

June 26, 2009

[*]Of the Ninth Circuit, sitting by designation.

**BOUDIN**, **Circuit Judge**.  In 2002, then-Boston Police Commissioner Paul Evans terminated William Broderick as a police captain in the Boston Police Department.  Broderick sued and in the district court a jury returned a verdict against Evans under 42 U.S.C. § 1983 (2006) and against the City of Boston under the Massachusetts whistle blower statute, Mass. Gen. Laws ch. 149, § 185 (2009).  The defendants now appeal and Broderick has cross-appealed.  On sufficiency issues, we recite the facts favorably to the verdict.

Broderick began working for the Boston Police Department in 1977 as a patrolman and was promoted to sergeant in 1986.  In 1988 Broderick was elected president of the Superior Officers Union ("the Federation"), a full-time position he held until 2000.  From this early time dates a relationship between Broderick and certain of his superiors, including Evans, of conflict and distrust.  The history includes public charges and law suits by Broderick and, on the department's side, disciplinary proceedings against Broderick and orders that he undergo psychiatric examinations.

Highlights are described in the district judge's decisions and orders in this case, including his detailed but unreported decision denying Evans' and the city's motion for summary judgment.  Other litigation occurred in federal and state court, e.g., Broderick v. Roache, 996 F.2d 1294 (1st Cir. 1993); Broderick v. Roache, 767 F. Supp. 20 (D. Mass. 1991), and before

-2-

the state Labor Relations Commission. Several episodes are important to the present case.

First, soon after he became union president, Broderick began to have disagreements with then-Commissioner Roache and with Evans, who was then police superintendent. In 1989, Broderick sued them claiming that he had been denied a promotion to lieutenant due to his union activity. Evans suspended him and ordered him to undergo a psychiatric exam. In 1992 the state Labor Relations Commission found that Roache and Evans had acted out of spite and anti-union animus and awarded Broderick back wages and ordered rescission of disciplinary sanctions.

In 1995, the parties settled Broderick's law suit. He was promoted to lieutenant retroactively with compensation, and got a commitment that his eligibility for promotion to captain would be arbitrated. In 1996, the arbitrator found that Broderick had been denied promotion to captain based on his union activities and ordered his promotion retroactive to 1992. According to Broderick, at his promotion ceremony Evans said that Broderick "lacked the integrity" for the position.

Second, when Broderick lost his bid for reelection as union president in 2000, Evans appointed him as supervisor of cases in the Suffolk Superior Court, a position normally given to a sergeant; admittedly, Broderick had not been engaged in policing for some years. In his new position, Broderick signed officers'

overtime slips when they were needed in court, concluded that officers were abusing the system, and complained about it. This led to embroilment with commanders of other units and individual officers, to the filing of internal complaints by Broderick against others (and their complaints against him), and to an internal investigation in which Broderick refused to cooperate.

Third, in February 2002, Broderick (according to his testimony) was cursed by occupants of a van at Downtown Crossing in Boston, was almost run down leading to an accidental discharge of his gun, pursued the van, and found it occupied by Suffolk County investigators who worked with the police Broderick had been investigating for overtime abuses. The van's occupants were arrested, but Evans arranged for their release and placed Broderick on administrative leave.

Broderick was later exonerated of wrongdoing in the gun discharge by the state police, although he was criticized for how he handled the incident, which included commandeering a taxi to chase the van after the insults were shouted at him. An internal affairs investigation also initially cleared him of other wrongdoing in the incident.

Fourth, on April 29, 2002, after internal affairs initially cleared him, Broderick was told he could go back to work in two days but that he had to submit to a physical and psychiatric exam. Broderick objected to the psychiatric exam, did not attend

it or various hearings on pending disciplinary charges, was given brief suspensions, and his mental and physical health began to deteriorate. In July Broderick sued in state court the city, Evans and another superior for retaliating against him for his complaints about overtime abuses.

Finally, at the beginning of August 2002, Broderick advised the city that he would be seeking early retirement and asked that further disciplinary action be placed on hold, and he later applied for a disability retirement. Evans refused to postpone pending disciplinary action; Broderick refused to attend, although saying he would now submit to a psychiatric exam. After much further maneuvering and further warnings, Broderick was terminated effective November 20.[1]

In the meantime, Evans and the city had removed Broderick's pending state court lawsuit to federal court. Following his termination, Broderick amended his complaint to include the termination. On pretrial motions, claims and defendants were pared down, but three relevant claims survived and proceeded to a jury trial--all based on Broderick's dismissal and incidents connected to it:

---

[1]Formally, the dismissal flowed from a series of complaints filed on September 11, 2002, against Broderick by a senior officer for past failures to report for the psychiatric exam, for failing to return his department issued vehicle, for failing to report for the imposition of discipline, and for failing to submit medical documentation providing a reason for his failure to appear at a prior disciplinary hearing.

first, that in violation of 42 U.S.C. § 1983, Evans had contravened Broderick's right under the First Amendment to be free from retaliation for engaging in protected speech about the overtime abuses;

second, that Evans, also in violation of section 1983, had retaliated against Broderick for exercising his constitutional right to petition courts; and

third, that through Evans and others the city had retaliated against Broderick in violation of the state whistle blower statute, Mass. Gen. Laws ch. 149, § 185.

After a seven-day trial in April 2006, the jury found in favor of Broderick on all three counts, and it awarded him $211,000 in back pay, $791,000 in forward pay, and compensation of $563,626 to cover taxes on the award. It rejected Broderick's claim to damages for emotional distress. The district court precluded the jury from awarding punitive damages on the section 1983 counts, finding that the evidence did not support the necessary heightened showing.

The district court denied various post-verdict motions by Evans and the city with one exception: on March 30, 2007, it granted Evans' renewed motion for qualified immunity as to the first of the three claims listed above, ruling that under a then-recent Supreme Court decision Broderick's speech about the overtime abuses was not protected under the First Amendment; but this did not affect the award of damages based on the law suit.

A defense motion for remittitur was denied and Broderick was eventually awarded attorney's fees and costs. Final judgment entered and both parties now appeal, raising multiple claims of

-6-

error.  We begin with the claims by Evans and the city attacking the adequacy of the evidence to support liability, the denial of qualified immunity for Evans, and the refusal of the court to order remittitur.

The claim that the evidence of liability was inadequate comes in two parts: (1) that no rational jury could have found that Broderick's discharge was "substantially motivated" by an aim to retaliate for his lawsuit or reports of overtime abuses, Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)(the showing needed for liability); and (2) that, in any case, the defendants showed that Broderick would have been fired even absent the protected conduct, id. (the so-called Mount Healthy defense).

So far as the defendants claim that a verdict should have been entered in their favor, fair inferences and credibility issues are resolved in favor of the verdict and our review of the district court's refusal to enter judgment as a matter of law is de novo. Lockhart-Bembery v. Sauro, 498 F.3d 69, 74 (1st Cir. 2007); Muniz-Olivari v. Stiefel Labs., Inc., 496 F.3d 29, 35 (1st Cir. 2007). The district court also declined to grant a new trial on the ground that the verdict was against the weight of the evidence; on this issue our review is for abuse of discretion. Colon-Millin v. Sears Roebuck De Puerto Rico, Inc., 455 F.3d 30, 35 (1st Cir. 2006).

Although Broderick complained about various other incidents--the ordered physical exam, the handling of disciplinary complaints against him, the refusal to delay proceedings--it is simplest and sufficient to focus on his discharge, which was the culminating event. The city and Evans say that the evidence revealed no more than a temporal connection between Broderick's protected activities and the adverse employment actions. See Acosta-Orozco v. Rodriguez-de-Rivera, 132 F.3d 97, 101 (1st Cir. 1997).

Some of Broderick's activities may have been justified; others, less so, but either way he was clearly a difficult subordinate. He publicly accused Evans and the department of racism in one episode and of improper searches and seizures in another; he refused to cooperate in the investigation of overtime abuses that he had himself prompted; the Downtown Crossing incident was disturbing; he refused to show up for hearings; he quarreled with other officers; and he brought multiple law suits against Evans and others.

So Evans and the city would in any event have had reason for wishing Broderick gone, but both of the assertedly protected activities caused further trouble for Evans and, in assigning weight to possible motives, the jury had evidence that Evans, the city or both had been found in the wrong as to Broderick's promotions; that Evans had made critical remarks about Broderick's

integrity; that psychological testing was not required in all accidental firearm discharge cases; and that deferring discipline to allow retirement is allegedly a common practice.

Because there were good as well as more doubtful reasons for wanting Broderick terminated, a certain amount of intuition is required in discerning the mix of motives. The district judge seems to have thought that Broderick's case was thin, as do we; and the jury may have felt that Broderick was unfairly treated in respects independent of his law suit or overtime dispute. But we cannot say that the jury was irrational in concluding that protected conduct played enough of a role in the mix to support a verdict.

Evans' position is weaker by far as to the Mount Healthy defense. The Mount Healthy defense, applicable only to the section 1983 claims against Evans, requires the defendant to show that even if an improper motive played a part, the adverse action would have been taken for legitimate reasons. Evans likely had justification for terminating Broderick; but no one can say for sure that, absent protected conduct, Evans would have refused to postpone disciplinary proceedings, as opposed to allowing Broderick to try to retire on disability. The jury's rejection of the defense was thus rational.

As for the motion for a new trial, judges rarely grant new trials on the ground that the evidence permitted the verdict

but leaned against it; and appellate courts still more rarely regard a refusal to grant such motions as an abuse of discretion. Credibility disputes and conflicting inferences make plenty of verdicts doubtful; but unless the judge on the scene thinks that the result is manifestly unjust, and has some hope of a different outcome on retrial, it is time to move on.

We turn next to Evans' qualified immunity claim. The district judge initially rejected qualified immunity as to both section 1983 claims (only the city was a defendant on the remaining state law claim submitted to the jury). Then, after the verdict and based on a new Supreme Court case, Garcetti v. Ceballos, 126 S. Ct. 1951 (2006), the district judge held that under that new decision Broderick's complaints about overtime abuses were not protected speech and, as to this, granted qualified immunity retrospectively.

Broderick says that the district court was mistaken but says that the issue is irrelevant if the judgment is not otherwise disturbed on appeal: the jury independently awarded the same damages against Evans on the other section 1983 claim, namely, that Evans was retaliating because Broderick had filed a law suit against him. The district court held that filing the law suit was still protected by the First Amendment, citing Supreme Court case law. Broderick v. Evans, No. 02-11540, 2007 WL 967861, at *2 (D. Mass. Mar. 30, 2007).

Evans does not now contest this latter ruling or argue that a retaliatory purpose in taking adverse actions against Broderick for filing the law suit would be protected by qualified immunity. He simply repeats, under the qualified immunity heading, his merits arguments that the evidence failed to show that retaliation either for the complaints or for the law suit was a substantial motivating factor in adverse actions taken against Broderick and that, in any event, the same actions would inevitably have been taken absent protected conduct. Our prior discussion of those factual claims need not be repeated.

Finally, the defendants argue that remittitur should have been ordered because the jury's award of damages was excessive. The failure to grant remittitur is reviewed for abuse of discretion, which we find only if a "jury's verdict exceeds 'any rational appraisal or estimate of the damages that could be based on the evidence before the jury.'" Smith v. Kmart Corp., 177 F.3d 19, 29-30 (1st Cir. 1999) (citations omitted).

The gist of the defendants' argument is that after termination Broderick made no effort to obtain other employment despite holding a law degree, i.e., failed to mitigate damages. Although they presented no evidence of possible jobs Broderick might have pursued or the pay he might have earned, they rely on Quint v. A.E. Staley Manufacturing Co., 172 F.3d 1 (1st Cir. 1999). In Quint, we held that the complete failure to seek other

employment obviates the employer's need to show the availability of substantially equivalent jobs.  Id. at 16.

Here, Broderick did in substance offer evidence allowing the jury to conclude that he likely could not have found a job earning substantial income.  Although he had a law degree, he was 52 at the time he was terminated and had no experience as an attorney.  His dismissal for cause would have complicated an attempt to find law enforcement work.  And Broderick's mental health had deteriorated, which would certainly have made finding and holding a substantial job more difficult.

The defendants, as already noted, offered no evidence as to Broderick's opportunities and did not focus on the mitigation defense in closing.  The jury awarded no damages for emotional distress; the awards of front and back pay were much lower than the amounts to which Broderick testified would represent his past and future income losses; and Broderick further testified that he was forced to cash in his pension following his termination to pay for living expenses.  The district court's refusal to grant remittitur was not error.

Broderick argues on cross-appeal that there was sufficient evidence to submit the question of punitive damages to the jury. Because the district judge's refusal effectively granted defendants' judgment as a matter of law, our review is de novo. Powell v. Alexander, 391 F.3d 1, 15 (1st Cir. 2004).  Punitive

damages are available where "the defendant's conduct is shown to be motivated by evil motive or intent, or . . . involves reckless or callous indifference to the federally protected rights of others." Id. (quoting Smith v. Wade, 461 U.S. 30, 56 (1983)).

At first blush, Broderick might seem to have a mechanically correct claim: that an improper retaliatory purpose was an element in his successful claim against Evans under section 1983 and that a jury could infer that such a purpose--to punish Broderick for filing a law suit--is inherently wicked or reckless. See Che v. Mass. Bay Transp. Auth., 342 F.3d 31, 41-42 (1st Cir. 2003); see also Powell, 391 F.3d at 19. Yet in this somewhat unusual situation, punitive damages would be wrong and close to a miscarriage of justice.

Mixed motives are common in both discrimination and First Amendment cases, but ordinarily in successful cases there is unequivocal evidence that the defendant acted at least in part out of a reprehensible motive such as racial or gender discrimination or a clear-cut desire to punish free speech; often, as well, the circumstances are vivid or egregious. E.g., Rodriguez-Marin v. Rivera-Gonzalez, 438 F.3d 72, 76-79 (1st Cir. 2006) (political discrimination); Powell, 391 F.3d at 19 (defendant concealed information to prevent reinstatement of officer who had filed a lawsuit); Che, 342 F.3d at 35-36 (racially offensive comments and unfair treatment).

-13-

In the present case, there is no <u>direct</u> evidence that Evans acted in whole or in part to retaliate for the law suit. Broderick stresses that Evans testified that he "knew" he could end up in court based on the handling of Broderick's case, but in context Evans was plainly referring to the fact that he knew Broderick was likely to sue, not to a perception that his actions would likely violate the law. Broderick had sued before on several occasions, Evan's apprehension was reasonable and it certainly was not an admission of deliberate wrongdoing.

Further, although the defense could not <u>prove</u> that Broderick would inevitably have been dismissed even without the law suit, his behavior over a substantial period would have given the most tolerant of employers reasons several times over to be glad to be rid of him. To the extent that the jury inferred that the law suit was a substantial motivating reason, this reason had to be submerged in a welter of other reasons, some good and some less so, but not themselves bases for a constitutional retaliation claim.

Finally, no evidence shows that Evans had any conscious purpose to violate the law. See <u>Kolstad</u> v. <u>Am. Dental Ass'n</u>, 527 U.S. 526, 535 (1999); <u>Iacobucci</u> v. <u>Boulter</u>, 193 F.3d 14, 26 (1st Cir. 1999). Deterrence, often an important element in punitive damages,[2] is hardly an objective in this case. Nothing

_____

[2]<u>See</u> <u>Smith</u>, 461 U.S. at 49; <u>Gutierrez-Rodriquez</u> v. <u>Cartagena</u>, 882 F.2d 553, 581 (1st Cir. 1989); <u>Alicea Rosado</u> v. <u>Garcia Santiago</u>, 562 F.2d 114, 121 (1st Cir. 1977).

-14-

contradicted Evans' own testimony that he put up with more from Broderick than he would have tolerated from anyone else. The district court's refusal to send the punitive damages issue to the jury in this unusual case may lack precedent; we supply that precedent now.

The trial judge handled a very difficult case, prolonged by the lengthy history between the parties, fairly and with balanced judgment. On this appeal, we leave the outcome unaltered and _affirm_ the judgment. Each side will bear its own costs on the appeal.

_It is so ordered._