# United States Court of Appeals
## For the First Circuit

No. 07-1633

ANDREA J. CABRAL, SUFFOLK COUNTY SHERIFF'S DEPARTMENT;
SUFFOLK COUNTY,

Plaintiffs, Appellants,

v.

UNITED STATES DEPARTMENT OF JUSTICE,

Defendant, Appellee.

No. 07-1640

JOHN PORTER, SR., as Personal Representative of the Estate
of SHEILA PORTER,

Plaintiff, Appellee,

v.

ANDREA J. CABRAL, SUFFOLK COUNTY SHERIFF'S DEPARTMENT;
SUFFOLK COUNTY,

Defendants, Appellants.

CORRECTIONAL MEDICAL SERVICES, INC.,

Defendant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Torruella, Selya, and Dyk,[*]
Circuit Judges.

_____

[*] Of the Federal Circuit, sitting by designation.

Ellen M. Caulo, Deputy General Counsel, for appellants.

Lowell V. Sturgill, Jr., Attorney, Appellate Staff, Civil Division, with whom Tony West, Assistant Attorney General, Michael K. Loucks, Acting United States Attorney, and Michael S. Raab, Attorney, was on brief for appellee U.S. Department of Justice.

Joseph F. Savage, Jr., with whom James Sweet and Goodwin Procter LLP, was on brief for appellee John Porter, Sr.

_____

November 12, 2009

_____

**TORRUELLA**, <u>Circuit Judge</u>.  This is a consolidated opinion addressing two related appeals.  Each appeal arises from Andrea J. Cabral ("Cabral"), the sheriff of Suffolk County, Massachusetts, barring Sheila J. Porter ("Porter"), then a nurse practitioner working as a contractor, from the Suffolk County House of Correction ("the HOC") on June 10, 2003.[1]

In <u>Porter</u> v. <u>Cabral</u> ("the underlying case"), Porter brought suit against Cabral, the Suffolk County Sheriff's Department ("the SCSD"), and Suffolk County (collectively "the Suffolk defendants") claiming that, in violation of her First Amendment free speech rights, Cabral barred her from the HOC for informing the Federal Bureau of Investigation ("the FBI") of alleged prisoner abuse at the HOC.  <u>See</u> Civ. Action No. 04-11935-DPW, 2007 U.S. Dist. LEXIS 12306 (D. Mass. Feb. 21, 2007).  Cabral contends that she barred Porter because Porter had failed to report that the alleged assault internally, to document the inmate's medical records, and to submit in a timely manner the report she was directed to write.

As part of the discovery process in the underlying case, Cabral served several written requests and subpoenas on the FBI and the United States Attorney's Office ("the USAO").  In an

---

[1]  To be barred is to have one's security clearance revoked. Cabral was contractually empowered to decide whether to bar a contract worker from the HOC.  Such barring would prevent the person from entering the HOC but would not terminate the person's employment.

Administrative Procedure Act ("APA") proceeding stemming from these requests ("the APA proceeding"), Cabral v. U.S. Dep't of Justice, Civ. Action No. 05-12468-DPW, Docket No. 7 (D. Mass. July 27, 2007), the district court denied the Suffolk defendants the discovery they sought. On appeal from the final order in that proceeding, the Suffolk defendants contend that the district court abused its discretion when it dismissed their APA action.

In the underlying case, a jury found in favor of Porter and awarded her $360,000 in compensatory damages and, against Cabral alone, $250,000 in punitive damages. The district court denied motions by the Suffolk defendants for a new trial and for remittitur, and granted Porter's motion for attorney's fees and costs in the amount of $275,437.24 plus interest. On appeal from the final judgment in that underlying case, Cabral challenges the fairness of her trial, considering the denied discovery and the award and amount of punitive damages.

After careful review of the record, we affirm the district court's rulings in both the APA proceeding and the underlying case.

## I. Background

### A. Facts

We outline the facts relevant to the appeals. Greater detail may be found in the district court's opinion in the underlying case. See Porter, 2007 U.S. Dist. LEXIS 12306.

-4-

Porter, a nurse practitioner employed by Correctional Medical Services, Inc. ("CMS"), began working on contract at the HOC in 1994. In 1999, the FBI recruited Porter to provide information about events at the HOC, which Porter did through May 2003.

On May 19, 2003, an inmate at the HOC, René Rosario ("Rosario"), showed Porter, who was on duty at the time as a nurse practitioner, injuries he alleged had been inflicted by a correction officer. In violation of her department's policy, Porter did not document her observations of Rosario's bruises and abrasions in Rosario's medical chart, she did not report the alleged assault to the Sheriff's Investigation Division ("SID"), and she submitted a written report to the HOC Deputy Superintendent, Mary Ellen Mastrorilli, about her encounter with Rosario nine days late, on May 28, 2003. Porter did promptly orally report the matter to her supervisor, CMS Health Services Administrator Donna Jurdak, and, on May 20, to FBI Agent Christa Snyder ("Snyder").

The following day, May 21, and again approximately two days later, Snyder spoke with Stan Wojtkonski ("Wojtkonski"), a SID Investigator at the HOC. During the course of their conversations, Snyder told Wojtkonski that the FBI had received information that an alleged assault on an inmate had occurred at the HOC and that Wojtkonski should check Rosario's medical records for information

about the incident. Wojtkonski told Snyder that the HOC suspected Porter was the source of the FBI's information about Rosario's alleged assault. Snyder neither confirmed nor denied Wojtkonski's suspicion.

Starting on May 22, SID began conducting an investigation of the alleged assault on Rosario. SID concluded its investigation in early June, finding that there was insufficient evidence to sustain Rosario's allegations. SID notified the FBI, which decided not to initiate an independent investigation.

On June 10, Cabral barred Porter from the HOC. Cabral claims that she disciplined Porter for failing to report that the alleged assault internally, for failing to document Rosario's medical records, and for failing to submit in a timely manner the report she was required to write. Cabral also claims that she was concerned about the fact that Porter wrote her report on Interdisciplinary Progress Notes, as if the report were a medical record, and that Porter dated the report the date of the encounter with Rosario, which Cabral considered to be backdating. Cabral acknowledges that, by June 10, she had become aware that Porter had provided information to the FBI about Rosario's allegations but denies this being a factor in Cabral's decision to bar Porter.

Later that day, Porter informed Snyder that Cabral had barred her. The following day, June 11, Porter met at the USAO with Snyder, FBI Agent Maureen Robinson ("Robinson"), and Assistant

United States Attorney ("AUSA") Stephen Huggard ("Huggard") to discuss her barring. The next day, June 12, First AUSA Gerard Leone ("Leone") spoke with SCSD Chief of Staff Elizabeth Keeley ("Keeley") by phone to schedule a meeting for June 16, 2003 ("the June 16, 2003 meeting") between Cabral and her management team, on the one hand, and United States Attorney Michael Sullivan ("Sullivan") and FBI Special Agent in Charge Kenneth Kaiser ("Kaiser"), on the other, ostensibly to meet each other and discuss general collaboration. As discussed below, this June 16 meeting would become a focal point of the litigation in this case.

The actual participants in the June 16, 2003 meeting were Cabral, Keeley, and Superintendent in Charge of the Training and Intelligence Division Victor Theiss ("Theiss"), all from the SCSD, and Sullivan, Leone, Huggard, Kaiser, AUSA Robert Krekorian ("Krekorian"), and retired FBI Special Agent David T. Nadolski ("Nadolski"). That meeting focused on Porter's barring, particularly Cabral's reasons for it. During that meeting and in subsequent correspondence between Cabral, Sullivan, and Huggard, the USAO indicated that it had opened a grand jury investigation into whether Cabral's barring of Porter constituted a felony under 18 U.S.C. § 1513 (concerning retaliation against a witness, victim, or an informant), specifically 18 U.S.C. § 1513(e), which provides:

> Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for

-7-

> providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years, or both.

## B. Procedural History

On September 3, 2004, Porter filed in the U.S. District Court for the District of Massachusetts her complaint in the underlying case, concerning Cabral's motivation for barring her, in which Porter sought money damages for unlawful termination and civil rights violations.

During the course of discovery in the underlying case in 2005, the Suffolk defendants made multiple written requests and served several subpoenas on the FBI and the USAO pursuant to regulations promulgated by the U.S. Department of Justice ("DOJ"), 28 C.F.R. § 16.21 et seq. The Suffolk defendants sought information and testimony concerning the June 16, 2003 meeting, communications between Porter and the FBI, and communications between Porter and the USAO. Defendants' requests are known as "Touhy requests," in reference to United States ex rel. Touhy v. Ragen, 340 U.S. 462, 468 (1951) (upholding the authority of agencies to promulgate regulations establishing conditions for the disclosure of information).

In a series of letters addressed to Ellen M. Caulo ("Caulo"), Deputy General Counsel of the SCSD, on June 28 and 30, 2005, Sullivan, acting on behalf of both the USAO and the FBI,

-8-

refused to comply with the Suffolk defendants' Touhy requests, contending that the requests were too broad and that compliance would (1) "reveal confidential sources and investigatory records compiled for law enforcement purposes," (2) "interfere with enforcement proceedings or disclose investigative techniques and procedures the effectiveness of which would thereby be impaired," and (3) be unduly burdensome. However, in a letter dated August 26, 2005, Acting U.S. Attorney James B. Farmer ("Farmer") informed Cabral that the FBI and the USAO had determined that certain documents and information could be disclosed to Cabral, including information pertaining to Porter and affidavits by Snyder and Robinson. Farmer's letter noted that Snyder and Robinson were authorized to present limited testimony at trial.

On September 28, 2005, the district court declined to hear a motion by the Suffolk defendants in the underlying case to compel Sullivan's compliance with their Touhy requests. The court indicated that a separate action under the APA was required.

Meanwhile, the grand jury investigation concerning Cabral's possible wrongdoing in barring Porter, during which Porter, Cabral, Keeley, and others testified, concluded in September 2005. In a letter dated September 28, 2005, Sullivan informed Cabral that the USAO had no intention at that time of seeking an indictment of her or the SCSD. Sullivan noted that the USAO determined that there was insufficient evidence to establish

beyond a reasonable doubt that a federal crime was committed in the process of barring Porter, but indicated that this conclusion neither exonerated nor inculpated Cabral.

In a letter dated December 5, 2005, Sullivan denied a further round of Touhy requests that the Suffolk defendants had submitted on September 8, 2005, explaining that the release of such information could "(1) reveal information on individuals or confidential sources without proper consent, (2) reveal investigatory records compiled for law enforcement purposes, and (3) interfere with enforcement proceedings or disclose investigative techniques and procedures the effectiveness of which would thereby be impaired." Sullivan added that compliance with such requests could also violate attorney work-product and attorney-client communications privileges. Through that letter, though, Sullivan did authorize disclosure of a redacted FBI memorandum recounting communications between Snyder and Porter and the SCSD regarding an incident at the HOC on May 19, 2003[2] (the date Rosario told Porter he suffered injuries from a correction officer) and an affidavit from Robinson stating that Porter did not accompany her to the HOC on June 11, 2003 (the day after Cabral barred Porter from the HOC).

_____

[2] Sullivan's letter states that the date of the incident at the HOC about which he authorized the disclosure of the memorandum was "May 19, 2005." It is clear from the letter, however, that Sullivan meant to write "May 19, 2003."

-10-

On December 8, 2005, the Suffolk defendants filed a complaint in the U.S. District Court for the District of Massachusetts, pursuant to the APA, asking the district court to set aside what they alleged to be "the arbitrary and capricious decisions of [Sullivan] not to provide discovery pursuant to Plaintiff's validly issued discovery requests." Cabral v. U.S. Dep't of Justice, Civ. Action No. 05-12468-DPW, Compl. p.1, Docket No. 1 (D. Mass. Dec. 8, 2005). Sullivan responded on January 20, 2006 by filing an opposition on behalf of the USAO and the FBI to this complaint. Sullivan's memo reiterated the points he made directly to Caulo in his June 2005 letters. Cabral v. U.S. Dep't of Justice, Civ. Action No. 05-CA-12468-DPW, Docket No. 2, Answer (D. Mass. Jan. 20, 2006).

On January 3, 2006, in connection with the underlying case, the district court requested that Anton P. Giedt, an AUSA and counsel for the FBI and the USAO, interview employees of the FBI and the USAO who were present at the June 16, 2003 meeting with Cabral, Keeley, and Theiss to collect information about Cabral's possible motives in barring Porter. Two days later, Giedt submitted an affidavit ("the Giedt Affidavit") to the court, which then conducted an in camera, ex parte hearing about it. The Giedt Affidavit reported the recollections the government officials had about what Cabral, Keeley, and Theiss had said regarding the reasons Porter was barred from the HOC. The affidavit also

-11-

reported on a subsequent telephone conversation about that meeting between Cabral and Sullivan. Each of these government officials recalled that Cabral and/or Keeley stated that one reason Cabral barred Porter was because the latter disclosed information to an outside agency, the FBI. The Suffolk defendants acknowledge that they were aware that an ex parte submission had been made, although they did not request its disclosure at that time. The Suffolk defendants state in their brief in their appeal in the APA proceeding that they did not view the Giedt Affidavit until February 2009, after they filed a motion to obtain it and after both the jury trial and the district court's dispositive rulings on the underlying case and the APA proceeding. The Suffolk defendants claim that the Giedt Affidavit "contains significant information supportive of the arguments made by the Plaintiffs at trial. However, the [district court] withheld the Affidavit and prevented the Plaintiffs from discovering the information contained within."

On January 5, 2006, the district court requested that the USAO make Leone available for testimony in the underlying case because he was the only government official present at the June 16, 2003 meeting who took notes. In response, in a letter dated the following day, Sullivan authorized Leone to provide deposition and trial testimony regarding the reasons Cabral, Kelley, and/or Theiss stated for the barring of Porter from the HOC. The same day Leone

-12-

was deposed by both parties and, on January 12, he testified in the underlying case.

After a seven-day trial in the underlying case, on January 19, 2006, a jury found in favor of Porter and awarded her $360,000 in compensatory damages and $250,000 in punitive damages. The jury unanimously found that (1) Porter had established by a preponderance of evidence that her protected speech in relaying Rosario's allegations of abuse to the FBI was a substantial or motivating factor in Cabral's decision to bar Porter from the HOC; (2) Cabral had not established by a preponderance of evidence that she would have barred Porter from the HOC even if Porter had not relayed Rosario's allegations to the FBI; and (3) Porter had established by a preponderance of the evidence that Cabral acted with a callous and reckless disregard to Porter's federally protected rights when she barred Porter from the HOC.

Approximately seven months after the trial concluded, on August 17, the district court provided an oral judgment in the APA proceeding in which it dismissed the APA petitions of both parties: the Suffolk defendants on one side and Porter on the other.[3] The court characterized the petition by the Suffolk defendants as "overbroad" and "unnecessary" to the proper resolution of the case. The court issued its order in writing on July 27, 2007. Cabral v.

_____

[3] Porter had also filed an APA action seeking documents the FBI and the USAO had not provided during discovery. The result of that APA action is not on appeal here.

-13-

U.S. Dep't of Justice, Civ. Action No. 05-12468-DPW, Docket No. 7 (D. Mass. July 27, 2007). Porter does not appeal from this decision, but the Suffolk defendants do.

On February 2, 2006, the Suffolk defendants filed motions for a new trial and remittitur in the underlying case. On June 23, 2006, Porter moved for attorney's fees.

On February 21, 2007, the district court denied the Suffolk defendants' motions and granted Porter's motion. Porter, 2007 U.S. Dist. LEXIS 12306, at *52-53. In denying the Suffolk defendants' motions for new trial and remittitur, the district court found evidence sufficient to sustain the jury's verdict, reasoning that "[t]he jury received significant direct and circumstantial evidence indicating that Ms. Porter's communications with the FBI about allegations of inmate abuse were a substantial or motivating factor in Sheriff Cabral's decision to bar her from the HOC." Id. at *4. The court also rejected the Suffolk defendants' assertion that the district court's pretrial rulings denying defendants the opportunity to depose individuals from the FBI and USAO were unduly prejudicial. The court found that "[d]efendants have demonstrated neither clear error nor prejudice in being denied the opportunity to cast their lines further into restricted FBI and USAO waters." Id. at *16.[4]

_____

[4] The district court, however, offered a caveat:

I continue to have considerable concern that in this and

-14-

The Suffolk defendants had also argued that the amounts of compensatory and punitive damages awarded by the jury were unsupported by the record and either merited a new trial on the issue of damages or else remittitur of the damage awards. The court found that the compensation award of $360,000 was less than the maximum economic damages supported by the evidence, which the court calculated (without present value adjustment) to be $379,000. Id. at *26-28. The court also concluded that the $250,000 punitive damage award met the requirements of fundamental fairness: the jury rationally could have found that Cabral acted reprehensibly by causing Porter to be deprived of a job for speaking to the FBI in violation of her First Amendment rights; the ratio of compensatory-to-punitive damages in this case, which the court calculated to be 0.69:1, raises no constitutional concerns; and the punitive damages of $250,000 are well below the civil penalties that could be imposed for comparable conduct, which, in this case, would have authorized up to three times Porter's lost wages of $379,000, benefits, and other remuneration and interest. Id. at *28-33.

---

other cases the Department of Justice has arrogated to itself under so-called Touhy protocols, see generally, 28 C.F.R. § 16.21, et seq., far too expansive a view of its power to restrict discovery from the Department. Nevertheless, I am satisfied that the interactive mechanism adapted to resolve disputes in this case struck a fair balance.

Porter, 2007 U.S. Dist. LEXIS 12306, at *16 n.3.

-15-

Porter died on September 17, 2007. On November 23, 2007, this court granted a motion to substitute John Porter, Sr., Porter's husband and personal representative of her estate as the party plaintiff.

The Suffolk defendants appeal the district court's rulings in both the APA proceeding and the underlying case.

## II. <u>Discussion</u>

### A. <u>Evidence and Discovery</u>

On appeal from both the APA proceeding and the underlying case, the Suffolk defendants challenge the district court's evidentiary and discovery rulings. Because these rulings relate to the same evidence sought through the Suffolk defendants' <u>Touhy</u> requests, we consider the district court's denial of them together. In both cases we affirm the district court's ruling denying the additional evidence and discovery.

#### 1. <u>The Underlying Case</u>

The Suffolk defendants contend that certain pretrial rulings of the district court in the underlying case deprived them of relevant and discoverable evidence, thereby warranting a new trial. In particular, the Suffolk defendants argue that the district court abused its discretion in authorizing only limited production of documents and affidavits and access to government officials' testimony, resulting in substantial prejudice to the defendants. "The burden of proving substantial prejudice lies with

-16-

the party asserting error." Hernández-Torres v. Intercontinental Trading, 158 F.3d 43, 50 (1st Cir. 1998) (internal quotation marks and citations omitted).

We review the district court's pretrial discovery rulings for abuse of discretion. Heidelberg Americas, Inc. v. Tokyo Kikai Seisakusho, Ltd., 333 F.3d 38, 41 (1st Cir. 2003). This court will only intervene in discovery "upon a clear showing of manifest injustice, that is, where the lower court's discovery order was plainly wrong and resulted in substantial prejudice to the aggrieved party." Id. (internal quotations omitted). We also review district court rulings admitting or excluding evidence for abuse of discretion. See United States v. Pakala, 568 F.3d 47, 52 (1st Cir. 2009). As discussed in Section II.A.3, we find nothing in the record indicating that the district court abused its discretion in making its pre-trial evidentiary and disclosure rulings.

### 2. APA Proceeding

The Suffolk defendants assert that the district court erred when it dismissed their APA action after concluding that the final agency action of the USAO and the FBI was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). The Suffolk defendants argue that their need for further disclosure outweighed the government's assertion of a qualified privilege, and that the district court

abused its discretion in ordering the dismissal. We affirm the district court's ruling.

The Housekeeping Act, 5 U.S.C. § 301, authorizes federal agencies to create rules governing discovery and disclosure. Touhy affirms this authority. See Puerto Rico v. United States, 490 F.3d 50, 61 (1st Cir. 2007) (citing Touhy, 340 U.S. at 468), cert. denied, 128 S. Ct. 1738 (2008).

Disclosure regulations of the DOJ are set forth at 28 C.F.R. § 16.21 et seq. Of particular relevance are §§ 16.26(a)-(c). Section 16.26(a) advises staff to consider the procedural and substantive background of the case. 28 C.F.R. § 16.26(a). Sections 16.26(b) and (c) permit disclosure only after balancing various factors, such as the importance of the legal issues presented; whether disclosure would violate a statute or regulation; whether disclosure would interfere with enforcement proceedings; and whether disclosure would reveal classified information, a confidential source or informant, investigatory records or techniques, or trade secrets. 28 C.F.R. § 16.26(b), (c).

To obtain information from a federal agency, a party "must file a request pursuant to the agency's regulations, and may seek judicial review only under the APA." Puerto Rico, 490 F.3d at 61 n.6. Under the APA, a reviewing court may overturn an agency's decision to deny disclosure only if the decision is found to be

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

We review de novo a district court's order dismissing an APA suit challenging an agency's response to a Touhy request. See Puerto Rico, 490 F.3d at 61. In applying the arbitrary and capricious standard of review, we apply the same deferential standard to the agency's decision as the district court. Id. As also discussed in Section II.A.3, we find nothing in the record indicating that the agency's denial of the Suffolk defendants' Touhy requests was arbitrary and capricious, and therefore affirm the district court's dismissal of the Suffolk defendants' APA action.

### 3. Analysis

The DOJ substantially complied with the Touhy requests of the Suffolk defendants. The DOJ authorized two FBI Agents (Snyder and Robinson) to provide affidavits and trial testimony, authorized a third DOJ employee (Leone) -- the only person who took notes about the June 16, 2003 meeting -- to provide a deposition and trial testimony, and disclosed certain relevant documents.

The denials of the Touhy requests that the DOJ released were reasonable. Aspects of the requests, such as the method of Porter's communication with the FBI, were overly broad and not directly relevant to the primary issue at hand: why Cabral barred Porter. Through an affidavit filed in camera and under seal, the

-19-

DOJ also explained how the release of undisclosed information would directly and adversely impact the FBI's investigations and violate the Privacy Act, 5 U.S.C. § 552a(b). Courts have found such explanations of law enforcement privileges persuasive. See Puerto Rico, 490 F.3d at 54, 62-64 (holding that, given "the public interest in effective law enforcement," the FBI may assert a qualified privilege to protect sensitive law enforcement techniques and procedures from disclosure) (citing Roviaro v. United States, 353 U.S. 53, 59 (1957)).[5]

Considering the disclosures and testimony the DOJ provided to the Suffolk defendants, in addition to the information available to the court through the Giedt Affidavit, the DOJ reasonably concluded that further disclosures, such as by authorizing more government officials to testify, would have been cumulative and unduly burdensome. See Fed. R. Evid. 403 (providing that relevant evidence may be excluded where it would be cumulative

_____

[5] The Suffolk defendants did not request other information about which they were aware, particularly an ex parte submission that contained the Giedt Affidavit, until after the jury trial and district court rulings. While the Suffolk defendants assert that they were not aware of the contents of the Giedt Affidavit until after trial, during oral argument counsel acknowledged that it was the notation of an ex parte submission on the district court's docket (available before trial) that led her to request the affidavit after the trial was concluded. The Suffolk defendants thus waived any claim to this submission. See Campos-Orrego v. Rivera, 175 F.3d 89, 95 (1st Cir. 1999) ("We have reiterated, with a regularity bordering on the echolalic, that a party's failure to advance an issue in the nisi prius court ordinarily bars consideration of that issue on appellate review.").

-20-

or a waste of time); Fed. R. Civ. P. 26(b)(2)(C)(i) (providing that discovery sought must not be "unreasonably cumulative or duplicative"). We have previously upheld such partial responses to Touhy requests. See, e.g., Puerto Rico, 490 F.3d at 66 (finding the FBI's decision to withhold certain Touhy materials was neither arbitrary nor capricious partly because "[t]he United States has been reasonably forthcoming in releasing [relevant] information").

The Suffolk defendants have also failed to show that the denial of this additional information was, as they claimed in their briefs in both the underlying case and the APA proceeding, unduly prejudicial. The Suffolk defendants offer nothing more than mere speculation that additional information would have, for example, damaged Porter's credibility or revealed recollections contradictory to those presented in the Giedt Affidavit. See Hernández-Torres, 158 F.3d at 50 (holding that an employee's "general assertion that the prospective [co-worker] witnesses would have corroborated his testimony concerning religious harassment . . . is insufficient"). Combined with our finding that additional evidence would have been cumulative or duplicative, we find that the district court properly dismissed the Suffolk defendants' APA action. See Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 244 F.3d 189, 193 (1st Cir. 2001) (finding no substantial prejudice where appellant "has not shown that the information sought . . . would be anything but cumulative or duplicative");

-21-

Hernández-Torres, 158 F.3d at 49-50 (1st Cir. 1998) (holding that the appellant failed to make a clear showing of substantial prejudice because he "ha[d] not shown that [the excluded] testimony would not be cumulative").

The Suffolk defendants have not shown that the agency's denial of their Touhy requests was arbitrary and capricious. The Suffolk defendants also fail to show that the district court abused its discretion in rendering its pre-trial evidentiary and disclosure rulings, or that the Suffolk defendants suffered substantial prejudice as a result. We thus affirm the district court's denial of this additional evidence and discovery, on the same grounds as the district court ruled: law enforcement privilege and that the information would be cumulative and unduly burdensome.

**B. Punitive Damages**

The Suffolk defendants challenge both the grant and the amount of punitive damages the jury awarded Porter in the underlying case, which the district court upheld.

**1. The Grant of Punitive Damages**

The Suffolk defendants assert that the evidence was insufficient to establish that Cabral engaged in the callous and reckless conduct necessary to support an award of punitive damages under 42 U.S.C. § 1983. We affirm the district court's ruling that the evidence was sufficient.

We review a punitive damages award de novo to determine whether the evidence presented at trial was constitutionally sufficient under § 1983. See Méndez-Matos v. Municipality of Guaynabo, 557 F.3d 36, 52 (1st Cir. 2009). The Supreme Court has held "that a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56 (1983). The inquiry is based on the defendant's subjective knowledge or intent. Romano v. U-Haul Int'l, 233 F.3d 655, 669 (1st Cir. 2000). Thus, the plaintiff must prove that the defendant "discriminate[d] in the face of a perceived risk that [her] actions [would] violate federal law." Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 536 (1999); see also Iacobucci v. Boulter, 193 F.3d 14, 26 (1st Cir. 1999).

We agree with the district court that, despite Cabral's acknowledgment that she knew that speaking to FBI agents was speech protected by the First Amendment, the jury received significant evidence indicating that a substantial factor in Cabral's decision to bar Porter from the HOC was Porter's communications with the FBI. Porter, 2007 U.S. Dist. LEXIS 12306, at *4, *29-30. The testimonies of Leone, Keeley, and Theiss provided direct evidence to this effect. Leone testified that, at the June 16, 2003 meeting, Keeley and Cabral both stated that a reason Cabral barred

-23-

Porter was because of Porter's communication with the FBI. Keeley testified that, in Cabral's presence at the June 16, 2003 meeting and without her contradiction, Keeley told DOJ officials that a reason Cabral barred Porter was because of Porter's communication with the FBI. Theiss testified that one of the only two reasons either Cabral, Kelley, or Theiss offered in the June 16, 2003 meeting for barring Porter was because she spoke to the FBI. Theiss further testified that at a later meeting only between himself, Cabral, and Kelley, Cabral offered the same reason for barring Porter. Concerning circumstantial evidence of Cabral's motive in barring Porter, among other things, Keeley told the specific person who informed Porter that she was barred that the reason for the barring was because Porter spoke to an outside agency.

We therefore agree with the district court that "[t]he jury could reasonably infer that Sheriff Cabral barred Ms. Porter with, at a minimum, conscious indifference to her First Amendment rights." Id. at *29. Cabral's indifference was reckless and callous to Porter's protected free speech rights because Cabral admitted she knew such rights were protected. We have upheld such punitive damages awards in other cases concerning the First Amendment. See Rodríguez-Marín v. Rivera-González, 438 F.3d 72 (1st Cir. 2006) (upholding a jury's punitive damages award where appellees discriminated against appellants on political grounds).

-24-

We further note that deterrence is "often an important element in punitive damages." Broderick v. Evans, 570 F.3d 68, 75 (1st Cir. 2009). Punitive damages in this case would help deter disciplinary actions against employees on First Amendment grounds. We thus see no reason to disturb the jury award of punitive damages.

## 2. The Amount of Punitive Damages

The Suffolk defendants contend that the punitive damages award of $250,000 was excessive as a matter of law. We affirm the district court's ruling that the award was not excessive.

We will uphold a punitive damage award "unless it clearly appears that the amount of the award exceeds the outer boundary of the universe of sums reasonably necessary to punish and deter the defendant's conduct." Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 81 (1st Cir. 2001) (citation omitted). If we find an award to be "grossly excessive," we may order the district court to enter judgment in a more appropriate amount of punitive award. Méndez-Matos, 557 F.3d at 38. The Supreme Court has provided the following guideposts for determining whether a punitive damage award was "grossly excessive": "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages award by the jury and the civil penalties authorized or imposed in

comparable cases." Id. at 52 (citing BMW of N. Am. v. Gore, 517 U.S. 559, 575 (1996)). We have found that the first factor in the BMW test, concerning the reprehensibility of the conduct, is the most important. Id. at 52-53 ("As the Supreme Court has repeatedly stated, and as we have long recognized, the degree of reprehensibility is the most important guidepost in the BMW test.") (citations omitted). In measuring such reprehensibility, the Supreme Court has instructed us to determine whether

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003).

The district court drew several conclusions about the punitive damage award. First, the district court observed that "[t]he jury rationally could have found that Sheriff Cabral caused Ms. Porter to be deprived of a job she found especially satisfying for speaking to the FBI, knowing full well that Ms. Porter's speech was constitutionally protected. Such conduct is certainly reprehensible." Porter, 2007 U.S. Dist. LEXIS 12306, at *31. Second, the district court found that a ratio of 0.69:1 compensatory-to-punitive damages is not constitutionally

-26-

problematic, given that a ratio of 4:1 has been upheld. Id. (citing Zimmerman, 262 F.3d at 82). Finally, the district court determined that civil penalties authorized in comparable cases of whistleblowing would authorize several times more than the $250,000 Porter was awarded. Id. at *31-32 (citing Mass. Gen. Laws ch. 149 § 185(d)(4)).

We agree with the district court's conclusions on each point. That the jury found Cabral's conduct to be reprehensible indicates that what we view as the most important factor in determining whether the amount of punitive damages was "grossly excessive" was met. That Porter's punitive damages award could have been greater bolsters our view that it was reasonable. We have previously upheld, on similar bases, the amount of punitive damages awarded to state employees suffering adverse employment actions in violation of their civil rights. See Rodríguez-Marín, 438 F.3d at 84-86 (upholding punitive damages awards of $120,000 and $195,000); Acevedo-García v. Monroig, 351 F.3d 547, 567 n.7, 571 (1st Cir. 2003) (upholding twenty punitive damages awards of $30,000 each); Rivera-Torres v. Ortiz Vélez, 341 F.3d 86, 89, 101-02 (1st Cir. 2003) (upholding punitive damages award of $250,000). We thus uphold the punitive damage award here as not grossly excessive.

**Affirmed**. Costs are assessed against appellants.